## ESTATE OF GEORGE MERKEL, DECEASED.

APPEALS BY E. SUNDAY ET AL., CREDITORS, AND BY W. R. MERKEL ET AL., ACCOUNTANTS, FROM THE ORPHANS' COURT OF BERKS COUNTY.

Argued March 5, 1889—Decided January 6, 1890.

[To be reported.]

1. Administrators, by virtue of their office, cannot occupy and lease land, or receive the rents and profits thereof accruing after the death of their intestate; such rents and profits belong to the heir. The powers and duties of the administrators with reference to the land are limited to an application for an order of sale, when this is necessary to pay debts, and to the proper execution of the order when obtained.

2. When lands of an intestate are subject to a lease at his death, neither the fact that he therein reserved a part of the rent to himself and his administrators, nor the fact that he afterwards assigned the other part of it to a creditor for application upon a debt, confers upon the administrators any power over, or imposes upon them any duty in relation to, any part of the rents accruing after the owner's death.

3. The personal estate is the primary fund for the payment of all the debts of a decedent, including mortgages upon his realty; and a payment by administrators of interest upon such a mortgage is a proper disbursement, when the amount and circumstances of the payment are such that it is not detrimental to the rights of other creditors, although the mortgage be a first lien and as such not dischargeable by an Orphans' Court sale to pay debts.

4. When administrators have not used or loaned the money in their hands, they are not chargeable with interest upon it during the time that an auditor is engaged in the task of settling the balance and making distribution; and they are not derelict for not investing, during such a proceeding, as they have a right to expect a decree of distribution at any time, and are required to be ready to pay out in pursuance of·it.

5. It is not error to refuse to impose upon administrators the costs of an audit to settle exceptions to their account and make distribution, although the auditor surcharged them with large sums, when strong ef-

forts were made to have other large surcharges, which the law did not require them to bear, imposed upon them, and the appointment of an auditor would have been necessary in any event.

6. When irregularities have occurred in the management of an administration, resulting in great loss to the estate, but the administrators have acted in good faith and under the advice of counsel, it is proper to allow them credit for fees paid to counsel, who were not their advisers until after the irregularities occurred, whose services were necessary, and who did not misadvise the administrators.

7. Nor should commissions be denied to administrators when there is no trace of fraud or bad faith in the execution of their trust although they adopted a course of management which rendered the estate insolvent, if its adoption was recommended by competent advisers and approved by creditors, and its unsatisfactory outcome was mainly due to causes they could neither foresee nor control: Swartswalter's Account, 4 W. 77 ; Stehman's App., 5 Pa. 413; and Clauser's Est., 84 Pa. 51, distinguished.

8. Administrators will not be surcharged on account of failure to obtain a better price for real estate sold to pay debts, when the smallness of the price is due to a general depreciation in values occurring during a delay to sell, which was in good faith, recommended by competent advisers, and approved by many creditors, and when the creditors asking for such surcharge did not object to the confirmation of the sale or apply to have the decree of confirmation opened.

9. It is the duty of administrators to convert the personal property within a year after the grant of letters to them. If, within that period, they make a fair public sale of it, the proceeds thereof is the measure of their liability ; but, if they delay its sale after the expiration of a year and until a general decline of market values occasions a depreciation in it, the loss thus occurring must fall upon them, because resulting from their neglect of a plain duty.

Before PAXSON, C. J., STERRETT, WILLIAMS, McCOLLUM and MITCHELL, JJ.

Nos. 192, 368 January Term 1888, Sup. Ct.; court below, number and term not given.

On May 11, 1877, Wilson R. Merkel and William M. Kaufman, administrators of the estate of George Merkel, deceased, filed two accounts of their administration of said estate, one relating to the personalty and the other to the realty. Exceptions to the account having been filed by creditors of the estate, *Mr. H. Maltzberger*, on September 11, 1877, was appointed auditor to pass upon the exceptions and make distribution of the money in the hands of the accountants. He reported, on January 22, 1887, the following findings of fact :

George Merkel, of Greenwich township, Berks county, Pa., died January 2, 1873.

Letters of administration upon his estate were granted to Wilson R. Merkel and William M. Kaufman who, on May 11, 1877, filed two accounts, one in reference to the personal property, the other concerning the real estate of the decedent. Up to the time of his death, which occurred very suddenly, George Merkel was extensively and actively engaged in business, principally in the manufacture of charcoal pig iron. He was the owner of two furnaces, one situated in Greenwich township, the other in Albany township, Berks county, Pa., and at the time of his death the furnace in Greenwich township was in blast. He was the owner of a number of tracts of woodland, of a farm and grist mill, and an iron-ore mine which had been leased to a firm of which he was for some time a member.

All his property was situated in the county of Berks. He was also a member of the firm of Merkel & Kaufman, who kept a country store near the furnace in Greenwich township.

An inventory of his personal estate was taken shortly after his death and filed in the register's office February 8, 1873, and the appraisement amounted to $92,680.57. Of this amount $80,647.31 was supposed to be good. From the account which was filed as to the real estate, it appears that it sold for $24,920.14. This amount was exclusive of a mortgage of $60,000, covering part of his real estate, and dower resting upon various portions, and the sum of $22,600 retained by the purchaser of the Moselem ore-bank to pay a claim of the firm of Bushong & Brother, subject, however, to an adjudication by the court. The real estate was therefore worth at least the sum of $107,520.14, which, with the personalty accounted good, made the value of his estate $188,167.45.

By a petition of the administrators to the Orphans' Court of Berks county, presented June 30, 1873, praying for an order to sell certain real estate therein described for the payment of debts, it appeared that the indebtedness of the decedent which had come to the knowledge of the administrators amounted to $152,680, and the estate was considered to be entirely insolvent.

An agreement was entered into by the heirs of Merkel, his widow and children, with the administrators, that the business of the decedent should be carried on by the administrators for

a period of five years. This the administrators undertook to do and they had the property in use from the death of Merkel to April 1, 1875, after which they rented the furnace to W. R. & E. F. Merkel for one year to April 1, 1877.

As the business in which the decedent had been engaged appeared to be profitable, and the solvency of the estate apparent, it was thought to be best for all parties in interest, creditors and heirs, that the business should be carried on by the administrators. As has been said, the heirs consented to this arrangement and several also of the creditors. Unfortunately, however, a period of general business depression began in 1873, and the venture of the administrators did not result in paying the debts and saving the property to the heirs as was contemplated.

Some of the debts of decedent were paid in full by the administrators; of others the interest was paid and some were partly paid.

The accounts filed by the administrators show an insufficiency of assets to pay the indebtedness of decedent, and exceptions being filed to the accounts by creditors, it is asked that the administrators be surcharged as follows:

1. With the sum of $7,316.37,* being the sum of $9,316.37, the amount of credit asked in the account, for decrease on sale of personal property, less the sum of $2,000, the appraised value of George Merkel's interest in the firm of Merkel & Kaufman.

The administrators continued the business of making pig iron at decedent's furnace, in Greenwich township, from the time that letters were granted them in 1873, to April 1, 1875, a period of more than two years.

At the death of George Merkel the furnace was in blast, and the continuance of the business was under the advice of reputable counsel, of some creditors and persons interested in the estate, and also under the judgment of persons interested in

---

* The amount of the loss on the personality, as here given by the auditor, was made the subject of the third assignment of error in the appeal of Elias Sunday et al., it being claimed that the ascertainment of the net loss as $7,316.37 was the result of a clerical error. The facts in relation to this matter are given in the arguments of counsel and the opinion of the Supreme Court.

the manufacture of pig-iron as to its advisability, and the agreement of the heirs that it should be done.

The furnace being in blast at the death of Merkel, with stock on hand and accumulating under the contracts that had been made by decedent, it would unquestionably have been an injury and a loss to the estate to have blown out the furnace at that time. Under the testimony, it appears that there was stock enough on hand at Merkel's death to run the furnace for between two and three months, which would have completed the blast at the usual time of the year. A blast was generally begun in May, and continued for a period of about nine months. The furnace was blown out by the administrators in April or May after Merkel's death, and it was considered to have been a heavy blast that year.

To the time of closing the blast in 1873, the auditor is of the opinion that the administrators were justified in continuing the business of the decedent as he had carried it on, and would probably have been culpable had they done otherwise. If at the close of the blast the personal property had been put up for sale and had brought less than the appraised value thereof, the administrators would properly be entitled to a credit on their account for the deficiency, in case they had charged themselves with the appraisement. But preparations were made for another blast and the furnace was again started, and though it appears but a single blast was made, the administrators only stopped making iron in February, 1875. Then came a sale of personal property in February, 1875, and final sales of personal property, March 11, 12 and 13, 1875, more than two years after Merkel's death. During this time the property was in use and was kept in repair. But a deficiency of $7,316.37, or decrease below the appraised value, arose from the sales held. Under the law, as the auditor views it, he is compelled to surcharge the administrators with this amount. The duties of an administrator are plainly prescribed, and it would need the consent of all the heirs and all the creditors to equitably relieve him or them from pecuniary responsibility, in case of a depreciation in the value of the estate or any part of it used in the carrying on of the business.

2. It is further asked that the administrators should be charged with the sum of $14,175, an amount of interest paid

upon the mortgage of $60,000 upon the furnace, homestead-farm, mill and ore-bank at Moselem.

Of this amount $45,000 was resting upon the Moselem ore, bank, and the total amount of interest paid by the administrators was $14,175.

An order of sale of real estate for the payment of debts was granted by the Orphans' Court of Berks county, June 30, 1873, and the administrators were authorized to sell purpart No. 6, being a tract of land in Richmond township, known as the Moselem ore tract, containing 175½ acres, and No. 7, a tract of land in Richmond township, containing 26 acres and 95 perches. The sale was held September 13, 1873. Tract No. 6 was returned as unsold for want of buyers, and the return was confirmed September 20, 1873. An alias order for the sale of purpart No. 6 was issued April 3, 1876; the sale was held May 6, 1876, and the property was sold to Frederick Leybrandt for $69,000, from which was to be deducted, as per the conditions of sale, $45,000, the amount of the mortgage upon the premises; and $22,600 was to be retained in the hands of the purchasers to pay a claim of Bushong & Bro., subject, however, to a decision of the court, and the balance to be paid to the administrators.

An effort therefore had been made to sell the ore-bank, the most valuable of Merkel's properties, within a year after his death. It is difficult to determine from the testimony the exact amount that was offered for the property at this sale, as one of the witnesses says the amount was $100,000, and the auctioneer himself testifies that it was $95,000. The matter may, however, not be important, in view of the fact that the property was not sold, the administrators announcing that it would not be sold for less than $125,000. It is certainly the fact, however, that a valid bid of $90,000 was made. In the judgment of the administrators the amount offered was less than what was thought to be the value of the property, and it was returned as unsold in their report to the Orphans' Court.

It was unfortunate for the estate in view of subsequent events, that the property was not stricken off at $90,000, for it decreased in market value thereafter to a very great extent owing to the financial panic which unsettled every industry. The attempted sale of September 13, 1873, was but a few days

prior to the suspension of the firm of Jay Cooke & Co., in Philadelphia, and that of Bushong & Bro., bankers of Reading. The financial crisis had a depressing effect upon the iron business and furnace property, and ore property depreciated greatly in value. In fact, Mr. Isaac Eckert, himself, largely engaged in the manufacture of iron, who, between the time of the attempted sale and the suspension of the firm of Bushong & Bro., had made arrangements to buy the property from the widow and heirs at the sum of $125,000, declined to complete them or have the sale consummated, but advised the continuance of the business of making iron by the administrators.

The ore-bank was not afterwards offered for sale until May 6, 1876, when it brought but $69,000, subject to all liens, as aforesaid.

It must be remembered, also, that when the bid of $90,000 was made, the lien of the mortgage of $60,000 was upon this property as well as upon another property, and as it was a first lien it could not be divested by the sale, and the conditions of sale made the amount to be paid the difference between the amount bid and the amount of encumbrance.

The interest upon the mortgage accrued semi-annually and was paid by the administrators, and they ask to be allowed credit for such payment in their account. They received the rents of the property, yet do not charge themselves with the amount thereof in their account. Under the rule in Burnell's Est., 9 W. N. 334, the credits taken for interest paid must be stricken from the account.

Merkel's administrators paid the interest on the mortgage as it became due out of such funds as they may have had in hand, and as they are not charged in the account with any rents received or profits resulting from the business, the presumption is that they were paid from the principal of the estate, and they must be stricken from the account. . , . .

3. It is also asked that the administrators be charged with $6,606.89, the cost of mining ore from the Moselem Iron Co,. from March 1, 1874, to January 1, 1875. Also with the market value of 1,937 tons, 4½ cwt., of ore from January 1, 1873, to October 1, 1873, amounting to $14,523.33. Also with 160 tons, 4 cwt., at $6.50, $1,067.30; ore from October 1, 1873 to December 1, 1873. Also with 91 tons, 9½ cwt., at $6, $548.85,

ore from December 1, 1873, to February 1, 1874; the sum total being $16,139.48, of which the administrators paid on account to Bushong & Bro. the sum of $8,000, leaving a balance of $8,139.48, with which amount it is contended they should be surcharged.

These claims are made under a state of facts which are set forth in the case of. Wilson R. Merkel and William M. Kaufman, administrators of George Merkel, deceased, plaintiffs in error and plaintiffs below, v. Frederick Leybrandt and Bushong & Bro., in the Supreme Court, Eastern District, March Term 1882, in which the Supreme Court affirmed the judgment of the Court of Common Pleas of Berks county, overruling exceptions to the auditor's report and confirming his report. The record of said suit was offered in evidence, and the auditor's report, which sets forth the facts in the case, is hereto appended. . . . .

The court, in the decision, recognized the principles laid down by the auditor in stating the accounts, and affirmed the law as stated by him, that the covenants in the lease were dependent, and that the administrators were compelled to take 5,000 tons per year at the cost of mining. Shall the administrators now be charged with the cost of mining and with the market value of the ore furnished them, either because the royalty accruing was diminished to the extent of said cost of mining, (said royalty being applied to the payment of Merkel's notes to Bushong & Bro.,) or because the value of the estate was diminished to the extent of the value of the ore taken out? As the administrators were compelled to take the ore at the cost of mining under the dependent covenants of the lease, they cannot fairly be charged with the amount.

Nor can they be charged with the market value of the ore, although the estate in their hands was increased to the amount of the ore received by them less the cost of mining. The ore was the product of lands. Rents and profits of real estate are not assets for the payment of debts, and therefore the administrators cannot be charged with them: McCoy v. Scott, 2 R. 222; Robb's App., 41 Pa. 45. Clearly, the ore received by the administrators under the terms of the lease, was in the nature of rent, and it belonged to the heirs, and for it the administrators would be accountable to them. The proceeds of this ore, together with the royalty, should have been taken to pay the interest

on the mortgages and the taxes. The auditor therefore declines to make these surcharges.

4. It is also asked that they be charged with the sum of $9,000, the difference between the amount bid at the first sale of the furnace property and homestead and that realized at the second sale, together with interest thereon.

It appears that this property was put up for sale without a formal order of the court having been taken out or granted. The price at which it was struck down was $30,000, and the purchasers were George F. Baer and others. The purchasers refused to complete the purchase or take the property, upon discovering the defect or want of an order of the court, and it was subsequently sold on October 27, 1876, to Spang, Erb & Hunsicker for $21,000. At the time of the first sale the administrators were in the hands and under the direction of a reputable attorney, whose advice in this regard they followed, and it would be an extraordinary hardship to visit them with a loss occurring from a cause over which they could possibly have no control: Neff's App., 57 Pa. 91; Calhoun's Est., 6 W. 185; Crist v. Brindle, 2 R. 122; Eyster's App., 16 Pa. 376; Bradley's App., 85 Pa. 514; Derbyshire's Est., 81 Pa. 18; King v. Morrison, 1 P. & W. 188. The auditor declines to charge them as asked for.

5. It is also asked that they be charged with the sum of $26,000, the difference between the amount of actual bid at first sale in 1873, $95,000, and the amount for which the Moselem ore tract was subsequently sold in 1876, to wit, $69,000.

The refusal to let the property go at the bid offered in 1873 resulted from a belief on the part of the administrators that the property was worth more and would bring more at a subsequent sale. In fact, a private offer had been made for the property of $125,000, and negotiations were in progress to complete the sale, and a time had been appointed for the execution of the proper papers. But events before spoken of occurred which put an end to all negotiations. The property fell in value, and it has not been shown that between the time of the attempted sale, and that of the actual sale in 1876, the premises were worth more than they brought or that they could have been sold for more. That the administrators were right in not allowing the property to go at $95,000, at the time it

was offered, cannot be doubted. True, the property brought less afterwards, but it was from a cause which they did not and could not foresee and which it is safe to say but very few, if any, did. The financial panic resulting from disastrous failures of that time was as sudden and as unexpected to them as to all others, and for it and the consequent deterioration in the value of property they were in no wise responsible. The same authorities may be cited as to this question of surcharge as to the one immediately foregoing, with equal application and effect.

Numerous claims have been presented against the estate and they are enumerated hereafter. Upon very many of them payments have been made by the administrators, both of interest and on account of the principal. But as the estate will not pay in full, the payments made are not considered in the calculations for dividends, but the principal of each claim is taken, and interest added to the day of the judgment rendered in the Court of Common Pleas of Berks county in favor of the Kutztown Savings Bank against this estate. This will place all claimants upon an equality as to dividend. From the amount of dividend as declared to each claim, the administrators can deduct the payments already made by them, if any. The amount of these payments with interest have been calculated and set opposite the claims to which they apply. . . . .

On December 16, 1886, counsel for creditors appeared before the auditor and asked that, 1. There should be a disallowance of counsel fees to the administrators for services of counsel during the pendency of the audit. 2. The imposition of a part of the costs of audit upon the administrators.

In the settlement of the exceedingly complicated affairs of this estate, there was an absolute necessity of wise counsel to the administrators, and this necessity continued during the progress of the audit. The long continuance of the audit was not alone owing to the effort made by the administrators to prevent surcharge. During its progress one of their counsel died and they were compelled to get new counsel, and counsel other than him they had when they undertook the trust. The accounts filed appeared to have been prepared in haste, and the administrators were dependent entirely upon their counsel and mainly in such preparation upon their clerk or clerks; and in

the effort to explain the credit items of the accounts, they had to rely upon such explanations as were given by the clerk who kept the books or those who examined them. What this amounted to, counsel are well aware, and the difficulty and length of time consumed in getting the information, even when undertaken by counsel and the auditor themselves, by an examination of the books, is well known to them and under the circumstances is not surprising. The proceedings before the auditor extended over a long period of time, they were frequently interrupted, and were considerably delayed by awaiting the determination of the case of the Kutztown Savings Bank v. Merkel's administrators.

The auditor does not find that there was gross negligence on the part of the administrators so as to warrant him in disallowing counsel fees. They were acting under the advice of counsel in reference to the matters as to which they have been surcharged, and though in the opinion of the auditor, this fact is not sufficient in law to relieve them from surcharge or responsibility, yet it is a sufficient answer to this application to strike out counsel fees and impose costs of audit.

: —After passing upon various other matters not involved in these appeals, the auditor re-stated the accounts in accordance with his findings, and reported a schedule distributing the balance which he charged against the accountants among the creditors of the decedent. Exceptions to the report having been filed both by creditors and by the accountants, the court referred the matter back to the auditor to take additional testimony and report further upon the questions raised by the exceptions.

On October 10, 1887, the auditor filed his second report. Therein he made a number of additional surcharges, and allowed a number of additional credits, not in question in the Supreme Court; adhered to the conclusions set out in the portions of his first report given above, and reported additional rulings, refusing requests of the creditors that he should surcharge the accountants with interest from the date of filing the accounts upon the balances thereby shown to be in their hands, which aggregated over $31,000, and also upon various items of surcharge, and that he should disallow all commissions to the accountants. With reference to the matter of charging interest

upon the balance shown by the accounts as originally filed, the auditor reported as follows :

If it were really the case that so large an amount of money as $31,000 remained in the hands of the administrators from 1877 to the present time, the ruling of the Supreme Court in Bruner's App., 57 Pa. 46, would compel the auditor to charge them with interest for at least a part of the time ; "with this sum in their hands and pending the lengthy proceedings before the auditor, it would have been the duty of the administrators" to invest it, or at least to have prayed the direction of the Orphans' Court upon the subject while the litigation was pending. But the fact is, that the larger part of this sum, if not the whole of it, was paid by the administrators to creditors, and it is admitted by the learned counsel for the creditors in his argument in these words : "It is true a large part of this balance has been paid to some of the creditors in excess of what they were entitled to ; but many others received little or nothing." Even though some of the creditors were inadvertently paid in excess of the amounts to which they were entitled, it is manifestly unfair to charge them with interest even upon such excess ; and if the great bulk of the money went to the creditors on account of their claims, the fact that some received nothing would not in itself be sufficient to warrant the auditor in charging them with interest on the moneys that had been paid by them to parties entitled to receive them ; that is, to creditors. The auditor declines to make the charge asked for.

Exceptions to the second report on the part of the creditors and of the accountants were disposed of in the following opinion, ALBRIGHT, P. J., 31st district, specially presiding :

The history of the settlement of this estate, and the questions raised by the exceptions now before the court, are clearly stated by the learned auditor. Therefore the court can proceed at once to consider the questions presented by the exceptions.

The great delay in the administration, and in the proceeding to adjust the accounts, and distribute, is made the foundation of several complaints by the creditors. It is demanded that the administrators be charged with interest on a number of sums received by them and that they be denied commissions. . . . . .

The blame for the great delay does not rest on the adminis-

trators alone. The creditors were negligent also. The law enabled the creditors to obtain an account of the administration at the end of the first year, and such further accounts from time to time as the court might deem necessary.

For neglect of duty the administrators could have been removed upon complaint by any one interested in the estate. While the matter was before the auditor, the creditors could have insisted at any time upon a distribution of what was in the administrators' hands upon a sum being set aside to meet claims in suit. There was at least one suit by a creditor in the Common Pleas of this county. The litigation with Leybrandt affected only the proceeds of one tract of land, and that, too, was an effort to realize in addition to what was in hand. If the administrators were too tardy in applying for an order of sale, or in making sales pursuant to orders, they could have been compelled to act: § 36, act of February 24, 1834, P. L. 80.

But it is profitless now to dwell upon the unaccountable delay, except so far as the fact of delay bears upon the demands to surcharge, to impose interest, and the commissions of accountants. By their exceptions the creditors assert that the compensation claimed and allowed by the auditor for the personalty and the realty ought to be stricken out and the administrators be charged with interest as follows : . . . .

Some of the questions thus presented, and many others arising in this record, are solved by a statement of the legal rights and duties of all concerned.

The furnace property, the iron mine property, and all the real estate, of which George Merkel died possessed, belonged to his heirs immediately upon his decease, as did also all the rents and profits thereof. The personal property belonged to the administrators for the purposes of conversion into money, and distribution of the proceeds to the creditors. Much of the contention relates to the rent of the iron mine. The ground for this contention disappears by a statement of the law on the point.

George Merkel owned the mine property in fee. In 1868 he demised it to Bushong & Co. for a period of 15 years. The lessees covenanted to pay to the " lessor, his heirs or assigns," $1 a ton (75 cents a ton when iron brought under $20 a ton) for all ore taken away, half yearly on the first days of May and

November, at least 5,000 tons a year to be taken or paid for each year after the first. The lessees further covenanted to deliver every year after the first, 5,000 tons of ore to the "lessor, his executors, administrators or assigns," to supply the furnace referred to and another, the lessees to be paid the cost of mining the ore so to be yielded, also on the first days of May and November of each year.

After George Merkel's death the administrators carried on the business of making pig-iron for upwards of two years for the benefit of the heirs, and in doing so received and used large quantities of ore produced at said mine by the lessees. That ore, or the cost of mining it, is the subject of complaints by the creditors. I said that the business was carried on for the heirs. Probably the intention was to prosecute it for the benefit of the heirs and the creditors, but as it proved to be a losing business, its results have not been brought into this proceeding. At the time of George Merkel's death, Bushong & Bro. held by assignment the right to receive said royalty of $1 a ton, as security for notes owing by Merkel.

The argument of creditors' counsel is, that said royalty and the ore to be delivered belonged to the administrators and must be accounted for by them; that at least that is true of the ore which was to be yielded to the lessor, his "executors, administrators and assigns." The royalty was to go to him, his "heirs or assigns."

This contention cannot be assented to. The rule of law is that all rent goes to the heir and not to the administrator. The ore to be delivered was rent also. It was something to be returned as a part of the consideration for the demise. The two covenants (for the royalty and for the ore) must be taken together. The intent was that both in the lessor's lifetime and thereafter during the term, the royalty and the cost of mining lessor's ore was to be settled for at the same time and the one sum deducted from the other.

But the decision of this point does not depend upon a construction of the lease alone. The rule of law settles it. When a man seised in fee makes a lease for years, the whole rent becoming due after his death shall go with his reversion to his heir and not to his executor; and though the rent should be expressly reserved to the lessor or his executor or assigns with-

out naming the heir, the executor cannot have it. On the other hand, if a lessee for years underlets reserving rent, the rent accruing after his death shall go to his executors or administrator, and not to his heir, even though the reservation were to him and his heirs without mentioning the executor: Williams on Executors, *730.

Thus it is seen that the administrators are not chargeable with the ore received as aforesaid, or with anything connected therewith.[1][2] . . . . .

The goods were sold upwards of two years after the appraisement, and after the administrators had stopped operating the furnace, in which business most of the goods were used. Credit for a decrease of $7,316.37 was claimed and refused by the auditor. The auditor charged the administrators with the value at which the goods had been appraised. The auditor by his first report found a balance of $41,159.63 in the administrators' hands, of personalty. This was considerably reduced by expenses and other credits subsequently allowed.

As to the demand to charge interest as above set forth: It is not alleged that the administrators received any benefit by using or loaning the money. But it is said that they ought to answer for the delay or the failure to invest pending the litigation, during the contest before the auditor. Among other cases that of Bruner's App., 57 Pa. 46, is cited to support this demand. But the reasoning in that case does not apply here. There was in this case no occasion for or propriety in investing. The time to distribute had arrived. The auditor was engaged in the task of settling the balance and making distribution. The administrators had a right to expect a report and decree at any time after the latter part of the year 1877, or the early part of 1878. A placing of the money at interest, almost necessarily on time, would have been improper. Had they applied to the court for authority to invest, they would no doubt have been told that the court would not by such action encourage undesirable delay. For these were trustees to convert and distribute, not to manage or invest.

If it could be said justly that the administrators alone were responsible for the delay since 1877, and especially that they caused it by introducing matters that did not belong in the proceeding, in that case they ought to be punished by the

imposition of interest. But by the showing of this record this cannot be imputed. The administrators had not the power to prevent a distribution of what was on hand, when the auditing commenced, and also what came into their hands afterwards. No proper consideration requires the charging of any of the items of interest mentioned.[5] [6]

In defence of the administrators it is urged that they never kept money on hand, but paid to creditors from time to time, and that they paid many general creditors in full under the belief that the estate was solvent. The auditor believed that this was the truth, and with this conclusion no fault is found. But that did not make the case of the unpaid creditors any better. It is a poor excuse for withholding one man's money to say that by mistake it was paid to another. The refusal to charge interest is based on the grounds that it is not shown that the administrators used or loaned the money, and because they were required to be ready at any time to pay out, in pursuance of a decree of distribution, which decree they had a right to expect at any time during the period in question.

Before discussing the said question of commissions on the personalty, the surcharge complained of by accountants will be considered. Most of the goods appraised were made use of by the administrators in carrying on the furnace business. They were not sold until upwards of two years after the taking of the inventory. They brought $7,316.37 less than their appraised value. For this the administrators craved and were denied credit. What the auditor says on this point and also as to the propriety of carrying on the business of making iron until the blast in operation at the time of Merkel's decease was finished and stopping then, is indorsed by the court.

It is admitted by all concerned, or at least it is incontrovertible, that after the spring of 1873 the administrators carried on the business at their own risk. One of the elements of that risk was that they must account to the creditors for what the goods were worth when they ought to have been sold. They were worth the appraised value. The prima facie evidence of the inventory has been corroborated by the testimony of the appraisers. The delay and irregularity in the sale of the realty, to be discussed hereafter, deprives the accountants of the excuse that they were warranted in postponing a sale of the personalty

until the furnace to which most of it belonged had been sold. The action by the auditor upon this question is approved.[a] [b] [3]

Are the administrators entitled to compensation for what they did respecting the personalty? They no doubt devoted much time and attention to it. But what was the purpose and result of what they did? There was a desire and expectation in the beginning to save something for deceased's family. This was a praiseworthy motive. But action for that purpose was not a legal duty. That it injured the creditors is plain. At an early period of the administration, there was ground to believe that the estate would prove insolvent; that the personal estate would prove insufficient to pay the debts must have been apparent from the beginning. The law contemplates and requires accounting in a year from the granting of letters of administration.

It is unnecessary to refer to many authorities to show how claims for compensation by trustees are to be regarded. The rules and considerations governing the question are well understood. Trustees are to be paid actual compensation for the value of their services, to be determined under the circumstances of the particular case. Compensation is allowed as the reward of faithful execution of the trust confided, and it is withheld where there has been confusion and procrastinating delay: Stehman's App., 5 Pa. 417. This is the rule. It is not applied with rigor, where the delay and departure from the requirements of law have not operated to the prejudice of the beneficiaries.

Can any one successfully assert that it would not have been better for the creditors if the administrators had within a year or two handed over to them the proceeds of the sale and collection of the personal assets, than to deal with them as they have been dealt with? The history and results of the administration permit a disinterested person to give but one answer, an answer unfavorable to the accountants. The law governing the case requires a withholding of compensation.[c] [d]

In reaching this conclusion the court concedes that the administrators meant well, paid many creditors in full, and probably paid out all they received from time to time. But that did not benefit those who were entitled to be, but were not paid, and who are still clamoring for their legal rights. Fail-

ure to perform duties imposed by law, resulting to the prejudice of those concerned is a sufficient ground to withhold compensation. Nothing worse than such failure is imputed here. . . . .

The creditors' exceptions raise questions connected with the sale of the land. The land belonged to the heirs. But it was subject to the lien of decedent's debts not of record, and could be sold to pay them under directions of this court.

When it appears to an administrator that the personal estate is insufficient to pay the decedent's debts, he should apply to the Orphans' Court for an order to sell real estate sufficient to pay the debts; if the administrator does not proceed to sell, any creditor can compel him to do so : § 20, act of February 24, 1834, P. L. 76. Any sale so made by an administrator requires the court's approval. Any one concerned may object to its approval. If the objection is deemed valid, the sale is set aside. Thus it is clear, that if the administrators delayed unwarrantably the sale of the land, because they hoped to obtain a better price, or for any other cause, the creditors who are now complaining could have ended the delay by resorting to the court. If they deemed the prices inadequate, they had their day in court to seek to set aside the sale and bring about others. Therefore, for legal reasons, added to those given by the auditor, the demand to surcharge because the real estate was not sold for more must be denied.[7] [8]

There is no valid reason to surcharge administrators simply for delay in selling land, or for not selling at a higher price than the one obtained. Of course, if it appeared that an administrator was actuated by a desire to benefit himself, or his relatives or friends, or that he was guilty of fraud in any form, he could be visited with the damages his wrong had occasioned. Then the decrees approving his sales would be no protection to him. But no fraud or improper motives are alleged in this case.

The effort here is to surcharge the accountants with the difference between what the main tracts sold for under order of court and the sums bid for the same at previous auctions. The auditor refused to surcharge. His reasons are deemed valid by the court. The cases cited by creditors' counsel, Moore's App., 10 Pa. 435; Springer's Est., 51 Pa. 342; Leslie's App., 63 Pa. 355; and Dundas's App., 64 Pa. 325, do not sustain his

contention. ' They are all cases where executors were vested by wills with powers concerning real estate. In the first, there was a question of surcharging for not realizing enough rent; the other three relate to the power to surcharge executors vested with power to sell land, for selling for less than should have been realized. The distinction between a case of that kind and that of a sale made by an administrator, with the approval of the court, is evident. I think that both fairness to all concerned, and an observance of the rules governing sales of real estate by administrators, under orders of court, require that any one interested who is dissatisfied with the price shall present his objection in the proceeding to sell, not to the account. He ought to except to the sale before its absolute confirmation, or apply to open the decree of confirmation. A resale, not a surcharge, is the remedy.

Whether the administrators are deserving of commissions for selling the land, is, however, another question. The auditor found that for the mine property sold at $69,000, at least $90,000 was bid at a previous auction, and the bid refused, and that the furnace property had been struck down at $30,000, but that sale was not consummated, and that it was afterwards sold for $21,000; also that several auctions of land were held by the administrators without orders of court. What was bid at each of said unauthorized auctions does not distinctly appear, except that $30,000 for the furnace property was bid at one of them. That sale fell through because it was made without order of court. The bidders signed the agreement, and they were amply responsible. It afterwards brought $9,000 less. · If no other cause to refuse commissions existed, would not this alone compel a refusal of such compensation?· That damage resulting from the administrators' negligence, the injurious effects of several times offering to sell without authority to do so, the delay in selling and the using of the real estate for the benefit of parties other than the creditors, after it was apparent that the land would have to be sold to pay debts, make the refusal of commissions a duty.[c] [d] For, as is said in the case of Stehman's Appeal, already referred to, commissions are given " as the reward of a faithful execution of the trust confided," not for occasioning " reckless confusion and procrastinating delay."

There is no good reason for refusing to credit for the $1,300 paid to counsel.[9] They were not the advisers in the early part of the administration, when the irregularities just referred to occurred. It is probable that the bulk of this sum was for conducting the proceeding against Leybrandt in the Common Pleas and in the Supreme Court. Then, too, the administrators required counsel in the long proceeding before the auditor. The administrators were not only defending when they were in the wrong, but strong efforts were made to impose upon them heavy burdens which the law did not require them to bear. This is shown by the minutes of the auditor and the exceptions in court. If it were disallowed it would be the administrators' personal loss, as it was paid long ago, other counsel now representing them. These fees were paid to counsel of high standing who certainly did not misadvise their clients.

What has been said concerning counsel fees also applies in part to the request to visit a portion of the costs of audit upon accountants. A further reason for refusing the request is that the audit would have been necessary in any event.[10]

The accountants complain of the auditor's action in refusing them credit for $14,175 interest paid by them at various times on the Tower debt of $60,000, which was secured by mortgage of the furnace and mine properties. It was the interest which fell due after the intestate's death, and up to the time the administrators conveyed to their vendees. The principal was deducted from the bids for said properties. I presume the properties were sold with an understanding that it should be done. By virtue of a local act of assembly the mortgage was not devested by the sale for the payment of debts. This exception must be sustained.[4]

The general creditors were not prejudiced by the payment. They take the balances of both the real and personal funds. If said interest had not been paid, $14,175 less proceeds of land would be on hand for them. In the second place, the creditor who had the land as a pledge had a right to be paid out of the personal property fund the same as the other creditors: Shunk's App., 2 Pa. 304; Morris v. Olwine, 22 Pa. 441; Keim's App., 27 Pa. 42. By resorting to both funds, the mortgagee did not disappoint the general creditors. No marshaling of assets was or is necessary.

This question deserved and received careful consideration by the court. The conclusions of the auditor respecting it have not been regarded lightly. There is room for a belief that the auditor's decision does equity. Still, it is useless to attempt to strain the law to reach a result, however fair it may seem to be. The auditor is of the opinion that the administrator paid it out of the rents and profits of the mortgaged lands. I do not think that fact is established, or that it would warrant the refusal of credit if it were established. The land was the property of the heirs, together with the rent issuing thereout, that is, the royalty and the ore to be delivered. It was encumbered by the mortgage. The general creditors had a statutory lien on the equity of redemption. The administrators, standing charged with the personal estate which came or ought to have come to their hands, and the proceeds of the sale of the land, including the equity of redemption of said two tracts, that is $14,640.13, (the items of $1,340, $7,105 and $6,195.13,) cannot be charged with anything more. They cannot be compelled in this proceeding to account for the rents and the profits of the land. The payment of the interest was a proper disbursement, was not detrimental to the general creditors, and upon no theory can credit for it be refused. If the mortgagee had taken possession by virtue of his mortgage and had appropriated the issues and profits of the land conveyed to him as security, such reception would have been on his debt. But he did not have possession. . . . .

A final decree was entered overruling exceptions of the creditors to the refusal of the auditor to surcharge the accountants with the value of the ore furnished to them under the lease of the Moselem tract;[1] with the price of mining and raising the ore, paid by them;[2] with interest on the balances in their hands pending the audit,[5] and interest on certain items of surcharge;[6] with the loss on the sale of the Moselem tract,[7] and the Maidencreek tract,[8] and with the counsel fees paid by the administrators,[9] and his refusal to impose upon the accountants the costs of audit;[10] sustaining exceptions of the creditors to the allowance of commissions to the accountants;[c][d] sustaining exceptions by the accountants to the disallowance of credit for interest paid upon the mortgage;[4] overruling exceptions by the ac-

countants to the refusal of credit for the loss on the sale of the personal property,[a] [b] and ascertaining the balances in their hands as affected by the disposition made of these exceptions.

Thereupon Elias Sunday and others, creditors of the decedent, took the appeal at No. 192 January Term 1888, specifying that the court erred:

1. In not surcharging with the value of the ore furnished from the Moselem tract.[1]

2. In not surcharging with the cost of mining and raising the ore.[2]

3. In surcharging with but $7,316.37, instead of $9,316.37, for the loss on the sale of the personal property.[3]

4. In allowing credit for the interest paid on the mortgage.[4]

5, 6. In not surcharging with interest on moneys in accountants' hands.[5] [6]

7, 8. In not surcharging with the losses on sale of real estate.[7] [8]

9. In allowing credit for counsel fees.[9]

10. In not imposing part of the costs upon the accountants.[10]

The accountants took the appeal at No. 368 January Term 1888, assigning for error:

1. The surcharge for the loss on the personal property.[a]

2. The refusal of credit for the same.[b]

3. The refusal of all compensation for the accountants' services.[c]

4. The striking out of the credits taken for commissions.[d]

*Mr. A. G. Green* (with him *Mr. Amos B. Wanner*), for the creditors of the decedent:

1. While it is true that lands descend to the heirs and as owners they are entitled to the rents, it is equally true that the descent is subject to the contract or will of the ancestor; and if by his contract he has provided, with a purpose in view, that the rents after his death shall go to his administrators, it does not seem reasonable to sacrifice this purpose to satisfy a principle of law based on feudal reasons. We submit that when he provided in the ore-lease that 5,000 tons of ore should be furnished annually to himself, " his executors, administrators or assigns," he and they to pay the cost and expense of mining and raising the same, the decedent had in view the purpose of

enabling his executors or administrators to sell his furnace property to greater advantage in the event of his death, and therefore the ore furnished to the accountants did not belong to the heirs, but was assets of the estate, with the market value of which, over and above the cost of mining, the administrators should be charged.

2. But if this be not so, there can be no question that the administrators are at least individually responsible for the cost of mining the ore. They were trustees of the estate, primarily for the creditors, and secondarily for the heirs: Robinett's App., 36 Pa. 188; McCandless's Est., 61 Pa. 9. To make the estate pay for mining ore consumed by themselves, for themselves and the heirs, is in direct prejudice of the rights of creditors, and a clear devastavit. As they left unpaid nearly the half of it, and the lessees, in the exercise of their rights under the lease, set this off against the royalty, the amount of royalty applied to the notes held by Bushong & Co., to secure which the royalties were assigned to them, was reduced by that amount. The royalty being thus applied to pay a debt of the administrators, instead of to the debt of the estate to Bushong & Co., as it should have been, the creditors of George Merkel suffered a loss for which his administrators are liable, and as they denied this liability, it is not easy to see why they should not be charged with interest thereon.

3. The amount of the surcharge for decrease on sale of personal property, was erroneously made $2,000 less than it should have been. The decedent's interest in the firm of Merkel & Kaufman was improperly included in the inventory and appraised at $2,000. It appears from a statement submitted to the auditor that in fixing the decrease at $9,316.37, the appraised value of that interest had already been deducted, and this fact being overlooked it was a second time deducted, as the auditor's report shows, and the surcharge made for only $7,316.37. As both the auditor and the court recognized the propriety of the surcharge, and the error is a clerical one, it should be corrected: Bierly's Est., 81* Pa. 419. The view of the law upon which the court allowed credit for the payment of interest on the mortgage, may be correct as applicable to an ordinary case, but this case is an exceptional one, the administrators having managed the real estate and collected

its rents and profits as agents of the widow and heirs under a written contract, and presumably they paid the interest out of those profits. Robb's App., 41 Pa. 45; and McCoy v. Scott, 2 R. 222, therefore, do not apply.

4. The administrators should have been charged with interest on the balances in their hands, during the pendency of the exceptions to their account. It was their duty to invest these balances, or ask the direction of the court, knowing, as they did, that the distribution would be long delayed: Bruner's App., 57 Pa. 46; Yundt's App., 13 Pa. 575; Evans's Est., 11 Phila. 113; Biles's App., 24 Pa. 335; and they are chargeable with nearly the whole of the delay. Moreover, it was shown that they used the whole personal estate in carrying on the furnace, etc., for the benefit of the heirs, among whom was one of the accountants. It was incumbent on them to show what was done subsequently with the moneys coming into their hands; as they have not done so, they are open to the conclusion that they used it for their own purposes: Fox v. Wilcocks, 1 Binn. 199; and in such case, or even if they let it lie unemployed, they are liable for interest: Fox v. Wilcocks, supra; Robinett's App., 36 Pa. 174; Clauser's Est., 84 Pa. 52; Biles's App., 24 Pa. 335. The claim for interest under the sixth assignment, rests upon the ground that the accountants either ignored or repudiated liability for the several items therein referred to.

5. The loss on the sale of the ore tract was evidently not due to an error of judgment on the part of the administrators, but to the fact that they were intent on carrying out their contract with the heirs, subordinating the interest of the creditors to that of the decedent's family. They were bound under the act of February 24, 1834, P. L. 76, to apply to the court for an order of sale, as soon as the insufficiency of the personal estate to pay debts appeared: Scott on Intest. Law, 2d ed., 588. The power given to creditors, by § 36 of the same act, to compel such an application, seems to be confined to judgment creditors, and the remedy is therefore neither prompt nor practical as to those not having judgments. It is true, too, that the confirmation of the sales made might have been objected to; but such objection would not bring back the bidders whose offers the administrators had long before declined. As

to the iron-works tract, there are additional reasons for a surcharge, the offering of this tract for sale three times, without having procured orders for that purpose, by reason of which omission the sales made fell through and the land was afterwards sold for less, being supine negligence : Leslie's App., 63 Pa. 355 ; Moore's App., 10 Pa. 435.

6. The attorney's fees paid, being largely for services in defending the accountants for gross dereliction of duty, must to that extent be borne by them individually. Any inability to apportion them is the fault of the accountants, and if they cannot show how much is properly chargeable to the estate, they must abide the consequences. That the court will make proper discrimination in such cases, is shown by Martin's App., 81 Pa. 263. The costs of audit are four-fold what would have been necessary had there been a fair and prudent administration of the estate, and a part of them should be borne by the accountants. The reasons given by the court below for disallowing commissions to the accountants, are not the only ones. Others may be found in the delay to sell real estate long after the experiment of making iron had resulted disastrously ; in permitting large accumulations of interest on debts ; in failing to sell much of the real estate, which thereby escaped all liability for the decedent's debts ; and in the general and utter disregard of the interests of the creditors. General expressions like those in Fross's App., 105 Pa. 258, and Price's Est., 81 Pa. 273, on which the accountants rely as to this point, when considered apart from the facts of the cases, are the cheapest kind of authority.

*Mr. George F. Baer* (with him *Mr. Jeff. Snyder*), for the accountants :

1. The refusal to surcharge with the value of the ore is based upon the plain principle that an administrator is not chargeable with rents of real estate, even though they be collected by him as administrator : McCoy v. Scott, 2 R. 222 ; Adams v. Adams, 4 W. 160 ; Schwartz's Est., 14 Pa. 47 ; Fross's App., 105 Pa. 258. In contending that this principle cannot apply because the lease stipulated that the ore should be furnished to the lessor, " his executors, administrators or assigns," our friends would not only abrogate " principles of law based on

feudal reasons," but also several modern statutes providing that land, with all that it implies, shall descend to the heir unless the owner manifest a different wish by the formal execution of a will or deed.

2. One would suppose, from the second assignment in the appeal of the creditors, that the accountants had received credit for the cost of mining ore, or had paid it out of funds of the estate. Such is not the case. It was paid by the administrators acting on behalf of the heirs. The substance of the complaint on this subject is, that it was paid in part by the appropriation of royalties arising under the lease, and thereby the application of the royalties to the debt due Bushong & Bro. was prevented. But as the royalties went with the reversion to the heirs, the administrators had nothing to with them: Haslage v. Krugh, 25 Pa. 97. Nor did the assignment of the royalties to Bushong & Bro. by the decedent, make them any the less a part of the inheritance. That the lessees had a right to retain the royalties and apply them as they did, was adjudicated by this court in 1882, in the case referred to by the auditor and court below. The administrators were powerless to compel their application to the Bushong debt.

3. As to the amount of the loss on the sale of the personalty there is no difficulty. It is conceded that the item of $2,000, for the decedent's interest in the firm of Merkel & Kaufman, was improperly in the inventory, and that the accountants were properly allowed a credit for it. But in calculating how much was lost on the sale of the personalty, the attorney of the accountants made the odd mistake of deducting the $2,000 twice, thus coming to the conclusion that the loss was only $7,316.37, whereas in fact it was $9,316.37. The mistake was one against the accountants, as it caused the amount for which they ask credit in their account to be $2,000 less than the actual loss. But as the credit was entirely disallowed, the mistake injured no one, and the attorneys of the creditors are in a curious state of confusion in thinking that because of it we should be charged with $2,000, in addition to the disallowance of the credit asked for.

4. The court, however, ought to have allowed credit for the loss on the personalty. It is clear that it was caused by the general depreciation in all values, a thing which the adminis-

trators could not foresee. They acted with good faith, in accordance with the light they had at the time. The creditors assented to their course, either expressly or tacitly. The work in operation at the furnace was continued, in obedience to the advice of an approved legal counselor, just as the intestate left it. In view of these facts, the accountants ought to be dealt with liberally by the court: Bosio's Est., 2 Ash. 437. The court ought to have allowed also the accountants compensation, as it is absolutely certain that they were guilty of no fraud or unfairness: Fross's App., 105 Pa. 258; Price's Est., 81 Pa. 273. The cases of Swartswalter's Acct., 4 W. 77; Stehman's App., 5 Pa. 413, and Clauser's Est., 84 Pa. 51, were instances of dishonest conduct.

5. The attempt to surcharge the accountants with the interest paid on the mortgage is unconscionable. The creditors got the benefit of the payments, for if they had not been made, the amount collectible out of the land on the mortgage would have been just so much greater, and the real estate fund would have been decreased by that amount. Interest so paid is regarded as an advanced payment, and the administrators take the place of the mortgagee to that amount: Robb's App., 41 Pa. 45; Torr's Est., 2 R. 250; McCurdy's App., 5 W. & S. 397; Greiner's Est., 2 W. 418. The administrators could not devote the profits of the land to the mortgage, those profits being held, not as administrators, but as trustees for the heirs: McCoy v. Scott, 2 R. 222; Robb's App., supra. The attempt to surcharge the accountants with interest on the funds of the estate. is harsh and unfair. The auditor and the court have given good reasons why it should not be done.

6. In the cases of Moore's App., 10 Pa. 435, and Leslie's App., 63 Pa. 355, upon the authority of which it is sought to hold the accountants liable for the depreciation in the real estate, it will be found that the trustees were in each instance invested with the title and occupied toward it a relation similar to that of administrators to personalty. Whether the accountants refused offers because they thought them inadequate, or whether they failed to complete sales because of not having procured an order in time, in neither case are they liable unless their conduct caused the subsequent depreciation. All the creditors acquiesced, at least by silence, in the delay to sell.

The auditor and the court have well indicated their rulings on this question, as also in the matters of counsel fees and costs.

OPINION, MR. JUSTICE McCOLLUM:

We have carefully examined and considered the several specifications of error filed in these appeals, and the able arguments for and against them.

Lands descend to the heir. The administrator cannot, by virtue of his office, occupy or lease them. The rents and profits accruing from them after the death of the owner belong to the heir, and the administrator is not authorized to receive them. The Orphans' Court may, on his application, order a sale of the lands for the payment of debts, if the personal estate is insufficient for that purpose. But his powers and duties with reference to them are limited to an application for an order of sale, and to the proper execution of that order when it is obtained.

The rights of the lessor under the lease to Bushong & Co., as well as the lands covered by it, descended to his heirs, and the transfer to Bushong & Co. of the rents accruing under the lease imposed no duty on the administrators in relation to them. They could not prevent the lessees from paying the rent to the heirs of the lessor with the consent of his assigns. It follows that they cannot be surcharged with the amounts so paid, nor the sums paid by the heirs to the lessees for mining the ore.

The creditors' third specification is destitute of merit. The administrators claimed a credit of $9,316.37 for loss on sale of personal property, but it was not allowed. They received a credit of $2,000, on the ground that the decedent's interest in the stock of goods in the store of Merkel & Kaufman was appraised at that sum, when in fact the stock was exhausted in the payment of the firm debts. This was just, and it seems that it was so considered by the creditors, because they did not except to it in the court below, and they do not complain of it here. It has no connection with the claim for decrease on sale of personal property, and, as the administrators were not allowed any credit on account of such decrease, its amount is immaterial.

That the mortgage creditor had a right to demand and receive from the estate all the interest that was paid to him by

the administrators is not denied. The personal estate was the primary fund for the payment of all the debts of the decedent, and it was the duty of the administrators to use it for that purpose. The lands covered by the mortgage were sold, under an order of the Orphans' Court, for $30,000 more than was required to satisfy the debt secured by it. It was well said by the learned judge of the Orphans' Court, in disposing of this question, that " the payment of the interest was a proper disbursement, not detrimental to the general creditors, and upon no theory can credit for it be refused."

We are satisfied with the refusal of the Orphans' Court to surcharge the administrators with interest on moneys received by them, with their disbursements for professional services, with the depreciation in the value of the real estate, and to impose on them the costs of the audit. The reasons for this refusal are clearly and forcibly stated in the auditor's report, and in the opinion of the court below, and it is unnecessary to re-state or enlarge upon them. All the specifications of error filed by the creditors in their appeal are overruled.

In the appeal by the administrators there are four specifications of error based on the denial of commissions, and of the claim for a credit for the loss on sale of personal property. It was the duty of the administrators to convert the personal property within a year after the letters were granted to them. If they had made a fair public sale of it within that period, their liability would have been measured by its proceeds. But they commenced their administration of the estate in the belief that it was solvent, and that the personal property would be taken by the family at the appraisal. They allowed this property to be used for two years in the prosecution of a business with which as administrators they had no lawful concern. In consequence of this use, and a general decline in market values, it sold for $7,316.37 less than it was worth when it came into their possession. This loss must fall upon the administrators, because it resulted from their neglect of a plain duty.

In passing on their claim to commissions, regard must be had to the conditions which environed them ; to the depression in business and the depreciation in values caused by a financial panic which affected every industry ; to the situation, extent,

and character of the estate; to the complications which embarrassed, and the litigation which necessarily delayed, the administration of it.   They have accounted for every dollar of the trust funds received by them; they have been surcharged with the loss on sale of personal property, and with all expenditures not sanctioned by the law; and they must lose the amount they have paid to creditors in excess of the dividend the estate will yield, although payment was made by them in the belief that the estate was solvent.   When they entered upon the duties of their office they adopted a course which was recommended by competent counsel, and which was then approved by many, if not all, of the creditors, and by sagacious and conservative business men.   While the outcome was unsatisfactory, it was mainly due to causes which they could neither foresee nor control.   There is no trace of fraud or bad faith in their execution of the trust.

We are of opinion, upon due consideration of all the circumstances, that the learned judge of the court below erred in depriving the administrators of commissions on the trust funds. The cases relied on to sustain and vindicate this action are Swartswalter's Acct., 4 W. 77; Stehman's App., 5 Pa. 413; and Clauser's Est., 84 Pa. 51.   In each of these cases there was strong evidence of fraud and dishonesty, and commissions were rightly denied.   They do not apply to and govern a case where the integrity of the accountants in all the trust transactions is conceded.   The first and second specifications of error in the appeal of the administrators are dismissed, and the third and fourth are sustained.

As to the appeal of the creditors,

> The decree of the court below is affirmed, and the appeal dismissed, at the costs of the appellants.

In the appeal of the administrators,

> The decree is reversed, and the record remitted for further proceedings in accordance with this opinion, the costs of the appeal to be paid by the appellees.