## Mellier's Estate.

Argued May 1, 1933. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

158

*Thomas Raeburn White* of *White, Schnader, Maris & Clapp,* with him *James E. Riely,* for appellant.—A demand by a preferred distributee does not deprive an administrator of all discretion as to when and how to liquidate the estate of a decedent: Waddell's Est., 196 Pa. 294; Detre's Est., 273 Pa. 341; Borell's Est., 256 Pa. 523; Brown's Est., 287 Pa. 499.

Claimant entirely failed to prove that failure to sell upon her demand caused her any loss, or the amount thereof: Wood's Est., 272 Pa. 8; Tyson's Est., 80 Pa. Superior St. 29; Ritter's Est., 11 Phila. 12.

*Robert T. McCracken,* of *Montgomery & McCracken,* for appellee.—Where a claimant has proved the fiduciary's retention of nonlegal investments beyond the time when they reasonably could have been disposed of and a loss occurs, it becomes the burden of the fiduciary to prove that the loss resulted, not because of a mere lack of attention to the administration of the estate, but because of conditions outside its control and regardless of the exercise of discretion and due prudence: Taylor's Est., 277 Pa. 518; Dempster's Est., 308 Pa. 153; Brown's Est., 287 Pa. 499; Tyson's Est., 80 Pa. Superior Ct. 29.

The measure of surcharge is the difference between the market values of the securities at the time they should have been sold, and the amount they were actually sold for.

Opinion by Mr. Justice Maxey, June 30, 1933:

On June 2, 1930, Amadee Augustus Mellier died, leaving two adult children, born of a first wife who had predeceased him, a widow and a putative "widow" whose relationship with him had begun during the lifetime of the first wife. This supposed widow, known as Mrs. Harold Wallace, or as Mrs. Jeanette P. Wallace, took out letters of administration on June 5, 1930. Her right to these was challenged by the second wife and the children. Negotiations concerning her status were carried on for approximately four months and ended on September 24, 1930, in an agreement providing, inter alia, that:

1. Mrs. Wallace was to resign as administratrix and consent to the appointment as administrator of any person or corporation proposed by counsel for the children.

2. Her accounts were to be confirmed and she and her surety released from any liability thereunder.

3. She was to be paid the amount of $21,000 in full satisfaction of all her claims against the estate, that sum to be paid in installments of $5,000 each on the 24th day of October, November, and December, 1930, respectively, and a further and final installment of $6,000 was to be paid on the 24th day of January, 1931, together with interest of 6% from the date of the agreement. It was also agreed that "such total shall be paid earlier than the installment dates herein designated if the condition of the assets of the estate conveniently permit and the parties of the third part hereby assign and transfer unto the party of the first part such portion of their distributive shares as may be necessary to meet the payments herein provided for to the party of

the first part, and expressly authorize the new administrator to make such payments on their behalf."

4. Application for new letters of administration was to be made immediately upon renunciation of the existing letters.

The Real Estate-Land Title & Trust Company was chosen administrator at the time of the agreement but the appointment was not actually made until four weeks later, i. e., on October 22, 1930. It received a copy of the agreement shortly after the latter's execution. The company was not, however, one of the signatories, though John M. Strong, its trust officer, had promised that it would be.

On June 2, 1930, decedent's gross estate consisted of speculative securities, then valued at $207,916.01. Some of these securities were deposited with a broker to secure a margin account, and others were hypothecated with a bank to secure a loan. The net value of the estate was then $78,000. During the time that Mrs. Wallace had been administratrix the value of these securities had greatly depreciated. At the request of the children she made no effort to sell them.

At the time of the negotiations leading to the agreement the net value of the estate had shrunk to $55,000; on September 24, 1930, the date of the agreement, its net value was about $42,000, and on November 5, 1930, $18,949.46.

On October 24, 1930, when the first payment under the agreement was due Mrs. Wallace, Mr. Stokes representing Mrs. Mellier, the widow, and Mr. Melvin, counsel for the decedent's two children, called upon Mr. Maene, attorney for Mrs. Wallace, to discuss the decline in the value of the securities. They declared that they did not want a liquidation then because there would not be much left for their clients. The next day they again met and Mrs. Wallace's attorney insisted "on there being $21,000 at all times," that "the estate be kept in a condition to make those payments." He tes-

tified that Mr. Strong, the trust officer, said he "realized it was the duty of the administrator to convert" and the witness replied to him: "That is all I am asking you to do." On October 25, 1930, the liquidation of all the assets would have produced slightly more than enough to pay Mrs. Wallace. Mr. Maene testified that on the 27th and 28th of October, 1930, he again conferred with Mr. Melvin and "insisted that the assets should be liquidated and there should be kept at all times $21,000 and interest for the payment of Mrs. Wallace." Mr. Melvin counselled delay in the hope that his clients might profit thereby. On November 6, 1930, Mr. Maene wrote the administrator as follows: "In view of a constantly descending trend in the market value of the securities comprising the estate, leaving at this time, however, sufficient in the estate to pay the amounts due to Jeanette P. Wallace, our client, under the aforementioned agreement [i. e., the one of September 24, 1930], together with all debts, costs and charges, we are under the necessity of notifying you that our client will hold you liable for any loss to her occasioned by your failure to maintain the net value of the estate sufficient to pay her distributive share in full and we will expect you to maintain said value by liquidation of the assets if necessary."

At that time the securities could have been liquidated to produce a net of about $18,949.46 for Mrs. Wallace. On November 5, 1930, Ristine & Co., stockbrokers, with whom some of the securities belonging to the estate were deposited in a margin account, informed Mr. Strong that "the account, to properly protect it, needs $8,000 and in view of the dangerous condition of the market we must ask that you give the matter immediate attention, as there is very little margin left."

On November 6th, the brokers notified him: "In accordance with your instructions over the telephone to-day, we have entered the following sales order for the

Estate of Augustus Mellier, Deceased" (listing a total of 1,105 shares of securities).

On November 8th they informed Mr. Strong that all of the securities referred to in the letter of November 6th had been sold except 50 North American Utilities Securities Corporation. They also informed him that "the drastic decline of the past few days in the remaining utility stocks has practically wiped out the equity in the account." They also informed him that unless he made "satisfactory arrangements before ten o'clock" on November 10th, the remaining securities would be offered for sale at the opening of the market. The account was finally completely liquidated and netted $31.50.

Practically all the other securities of the estate were hypothecated with the Fidelity-Philadelphia Company as security for a loan of $97,000. These securities were inventoried at $151,254.50. This account was also finally liquidated for want of additional margin. The equity in this account on October 24, 1930, was $19,795.25. On November 6th it was $15,602.25. After liquidation the administrator received 50 shares of Central States Preferred, 40 shares of this corporation's new preferred of 1929 and $2,500 Pennsgrove Water Supply 5s. The latter were sold in November, 1931, for $1,118.75. The other stocks mentioned had not been sold. They could have been sold in November, 1931, for $3,480. Mr. Maene learned of the liquidation and of the prices realized on April 8, 1931, after several demands for this information had been made.

In addition to the collateral deposited with the two principal creditors (the broker and the bank) there were some securities in the safe deposit box of Mary Etta Mellier, the widow. She set up a claim to them but, as the court below found, it was a "feeble claim," and the administrator was unduly inactive in securing possession of them. Mrs. Mellier relinquished her claim to these securities on January 4, 1932. They were worth

at decedent's death, $8,000; on October 24, 1930, $4,106. They were finally sold for $1,153.75.

The auditing judge surcharged the administrator with the market value of all the securities of the estate on November 6th. Exceptions were taken to this adjudication and the court below held that the administrator had no discretion to refuse the demand of Mrs. Wallace that the securities be sold immediately and that it should have complied with this demand on or before November 6, 1930. It surcharged the accountant with the amount of $18,260.18, which represented the full value of the securities as of November 6, 1930, less the debts. A decree affirming the judgment of the auditing judge was entered to that effect. Judge HENDERSON of the court below said in his adjudication: "Its [i. e., the administrator's] plain duty was a prompt conversion of the assets. This was demanded by the two large creditors, and as they were in a position to enforce their demands they were accorded such a conversion as saved them from any loss. Not so with the preferred distributee— Mrs. Wallace. She had no similar means of enforcing her demands, and counsel for the accountant urges that she and the children who took what was left, were equally the object of its concern. I cannot agree that they were 'equally' such object. By her assignment Mrs. Wallace had a preference and her demand was the voice of all.

"The primary duty of the accountant was to preserve the assets, not to endeavor to increase them. When Mr. Melvin as counsel for the children demurred to a prompt sale because his clients would get so little, the accountant should have recognized his right to take in kind upon his clients advancing the cash to pay Mrs. Wallace."

The question in this case comes down to this: A preferred distributee demanded that the corporate administrator sell the securities entrusted to it so that the preferred distributee's share of the estate may be paid

to her. The secondary distributees insisted that the securities be held so that, when the market rises, they may yield sufficient to take care of their distributive share in the estate also. What was the legal duty of the administrator under these circumstances?

Appellant concedes that "if creditors demand an immediate liquidation of an estate, or if, after all creditors have been paid, *all* parties in interest demand a sale, certainly it is the duty of the administrator to heed this demand and act with reasonable promptness," but appellant contends that in this case the administrator was under no obligation to heed the demand of Mrs. Wallace, the preferred distributee.

Appellant cites Waddell's Est., 196 Pa. 294, 46 A. 304, in support of its position. The facts in that case differ so widely from the facts in this case as to make it of no value as guidance here. In that case (1) the executors were given the power to sell testator's property "as soon as the same can conveniently be done with advantage to my [i. e., testator's] estate." (2) There was not, as this court said, "investment [by the executor] in a venturesome business." (3) Two of the legatees wanted the property sold, but the other five legatees, when requested by the executor to sign an agreement that it should be sold, declined to do so. Appellant also cites Borell's Estate, 256 Pa. 523, 100 A. 953, and Brown's Estate, 287 Pa. 499, 135 A. 112. These cases differ from the case now before us in that the records disclosed no evidence that the stock held by the respective executors was of a highly speculative character or that the legatees or creditors demanded that the stock be sold.

In the case before us, the widow and the son and daughter of the decedent, by express agreement, gave Mrs. Wallace's claim against the estate a preference over theirs. They authorized the payment of $21,000 in cash to Mrs. Wallace out of the estate, on the date specified, or "earlier......if the condition of the assets of the estate conveniently permit" and they "assigned and

transferred" to her "such portion of their distributive shares as may be necessary to meet the payments herein provided for." This was equivalent to their saying to Mrs. Wallace: "Your claim against this estate is paramount to ours." This being the fact, the voice of Mrs. Wallace while perhaps not "the voice of all" (as the court below said it was) was certainly the voice of paramount authority. As a distributee of the estate she outranked the widow and the children, the latter three persons having conferred for a valuable consideration this higher rank upon her, and therefore the administrator was bound to obey the command of this *superior* beneficiary or distributee in exactly the same way he would have had to obey the commands of *all* the distributees *if all* had been of equal rank and *all* had joined in the demand for the sale of the securities. When Mrs. Wallace ordered the sale of the securities, they were then of sufficient value to satisfy her demand; by refusing to sell, in the hopes of a later rising market, the administrator was in effect gambling with her money to gain something for the claimants of secondary rank. This it could not do except at its own risk.

It is not a case where an administrator or an executor can exercise his own discretion when there were no authoritative demands made upon him that he sell the securities of an estate, or when there were conflicting demands by distributees of equal rank. This is a case of a demand upon the administrator by a person who had been given the status of a superior cestui que trust by the express agreement of all the other cestuis que trustent. When these other cestuis, i. e., the widow and the children, insisted that the administrator should *not* sell these securities, which at the then market price would yield only a sum far short of the widow's and children's earlier expectations, but should hold them for a hoped-for rising market, the obvious duty of the administrator was to offer the securities to these distributees at a sum sufficient to meet the claim of Mrs.

Wallace, and let *them* assume the risks of a speculative market. This he did not do, but cast upon Mrs. Wallace exclusively "the hazard of the die."

Shinn's Estate, 166 Pa. 121, 30 A. 1026: In this case decedent owned a lease of iron ore property in which he had invested a large sum of money. The undertaking was of a hazardous nature. The ore was uncertain, both as to quantity and quality, and the cost of production was not known with even proximate certainty. The value of the ore when ready for the furnace was certain to be subject to the wide fluctuations of the iron market. The administrator, without consultation with creditors, and with no cautionary order from the court, and simply upon the advice of the next of kin, whose only hope for a share in the estate was in the preservation of the lease, expended a large amount of the money of the estate upon the leasehold. The business proved a failure and a large sum was lost to the estate. In that case this court said in an opinion by Mr. Justice DEAN (page 130): "Joseph A. and John K. Shinn, next of kin, examined the property, and they advised him [the administrator] to continue it in operation. It was their interest to do so......If it proved successful, there would be a surplus to go to them, the next of kin; if unsuccessful, they were no worse off, as the loss would fall upon the creditors. Yet the administrator took the creditors' money and invested it in a wild speculation. He might, almost as safely, have invested it in stocks on the prospect of a rise. This was not ordinary business sagacity or prudent management."

Appeal of Matthews, 76 Conn. 654, 57 A. 694, (Supreme Court of Errors of Connecticut): In this case an administrator carried in the name of the estate speculative stock accounts on margin. Whatever the brokers required was obtained by sales of stock. The widow and three heirs consented at all times to the carrying of this speculative account by the administrator but at the end of January, 1893, another heir withdrew her ap-

proval. It was held that the administrator was liable to the latter heir for the resulting losses after January 31, 1893. The Supreme Court of Connecticut said (page 697): "All the property of the estate, including these securities, was in a certain sense a trust fund in the hands of the administrators......The administrators had full knowledge that a part of that fund......was subject to the great hazards of the business of stock speculation......It was clearly their duty not to carry the speculative accounts for speculative gains, but to settle those accounts in a reasonable time, and thereby withdraw the securities from the perilous business in which they found themselves pledged. An administrator or an executor, in the absence of authority therefor, is not permitted to use any part of the estate in trade or manufacturing or stock speculation, or other business venture whereby the trust fund is put at hazard; and the doing by them of any of these things has generally been regarded as a breach of trust, rendering them personally liable for resulting losses, while incapable of sharing in accruing gains.....The administrators..... carried these accounts along as speculative accounts, for speculative purposes, in the hope of gains purely speculative and problematical......In doing so they clearly deviated from the strict line of their duty......They conducted the business of stock speculation in good faith and with ordinary care and prudence. But the law forbade them to enter upon or continue in that business, and, when charged with disobeying the law, it is no answer to say that the forbidden thing was done in good faith and with ordinary care and prudence. For loss resulting from this breach of duty the administrators are accountable to the widow and heirs, unless the acts which caused the loss were done with the consent and allowance of the widow and heirs."

Appellant also complains that the accountant in this case was surcharged with the value of the securities belonging to the estate as of the date November 6, 1930,

on the theory that if appellant had acted immediately when requested to do so by Mrs. Wallace, it could have converted these securities into cash and paid her the amount of the surcharge in addition to the amount which she will receive. It is the contention of appellant that Mrs. Wallace offered no evidence whatever that the securities, or any of them, could, after her demand, have been converted into cash on or before November 6th.

In answer to that the record shows that counsel respectively for Mrs. Wallace and for the administrator entered into a "stipulation as to the market value of the assets of the estate on November 6, 1930." "The 'market value' of property is the price which the property will bring in a fair market after fair and reasonable efforts have been made to find a purchaser who will give the highest price for it. . . . . . The word 'market' conveys the idea of selling, and the 'market value,' it would seem to follow, is the selling value. It is the price which an article will bring when offered for sale in the market." Words and Phrases, first series, volume 5, page 4383.

The parties having agreed as to what "the market value" of these securities was *on November 6, 1930,* it follows that the court below was justified in finding the factor of market value in this agreement and basing the amount of surcharge thereon, for the date covered by this agreement was the date the attorney for Mrs. Wallace gave explicit written notice to the administrator to liquidate these securities before they should shrink to a value insufficient to pay Mrs. Wallace's distributive share in full. It was, therefore, on that date that the administrator failed in its duty by disobeying the order of the one distributee whose fiat in this matter was "law."

The decree is affirmed at the cost of appellant.