## Jenks' Estate

Before Lamorelle, P. J., and Gest, Henderson, Van Dusen, Stearne and Sinkler, JJ., and Marx, P. J., twenty-third judicial district.

The facts appear from the following extracts from the adjudication of

MARX, P. J., twenty-third judicial district, specially presiding, Auditing Judge.—William E. Jenks died February 22, 1931, unmarried and without issue. He left a will, dated October 5, 1918, and a codicil thereto, dated September 27, 1922, which were duly probated February 22, 1931, and under which letters testamentary were granted February 28, 1931, to Girard Trust Company, this accountant. . . .

In behalf of the two life beneficiaries, objection was made to the disposition and accounting of certain assets which came into the hands of this accountant.

The account discloses a loan to the accountant by Girard Trust Company of $16,561.57. The proceeds of this loan were paid June 4, 1931, to Moyer and Company, in satisfaction of a loan of the decedent, for securing which the broker held securities and shares of corporate stock of the decedent as collateral.

Having acquired possession of these assets, the accountant sold or charged itself with the market price as of August 28, 1931, of 194 shares of Bethlehem Steel Corporation, common, no par, stock, at 39¾. The stock had been appraised at 65⅞. The transaction, accordingly, showed a net loss of $7,724.85.

On the same day, the accountant sold or charged itself with the market price of 100 shares United Gas Improvement Company, common, no par, stock, at 29¼, the same having been appraised at 32. The net loss on this sale was $290.

On the same day, the accountant sold or charged itself with the market price of 100 shares Pennroad Corporation, common voting trust certificate for no par stock, at 5⅝, the same having been appraised at 7⅞. The sale resulted in a loss of $257.50.

On the same day, the accountant sold or charged itself with the market price of 125 shares Pennsylvania Railroad Company stock at 36⅞. The stock had been appraised at 63, netting a loss on the sale of $3,034.37.

Objection is now made that the accountant exercised no diligence, or a lack of diligence, in selling the aforesaid assets, resulting in an avoidable loss to the estate. Under a stipulation filed, the record of market sales from February 28, 1931, to June 4, 1931, was submitted. It reads as follows:

"It is hereby stipulated and agreed by and between John Wintersteen, Esq., attorney for Girard Trust Company, executor of the estate of William E. Jenks,

deceased, and Herman Steerman, Esq., attorney for Lydia D. Jenks and Meta E. Schlack, neé Jenks, that the market values of the stocks hereinafter mentioned, on the dates hereinafter set forth, are the true and correct values:

| Date | Bethlehem Steel com. no par | | United Gas Imp. com. no par | | Penna. Railroad par 50 | | Pennroad Corp. common | |
|---|---|---|---|---|---|---|---|---|
| | High | Low | High | Low | High | Low | High | Low |
| 2-28-31 | 68 | 66 | 34⅜ | 33⅝ | 63 | 62¼ | 7¾ | 7¼ |
| 3-28-31 | 58¾ | 56⅝ | 33⅝ | 32½ | 57 | 56¼ | 6⅞ | 6⅝ |
| 4-28-31 | 47¾ | 45½ | 29⅞ | 28½ | 54⅜ | 52 | 6 | 5¼ |
| 5-28-31 | 41⅝ | 39½ | 28¼ | 27⅞ | 47 | 45¼ | 5½ | 5 |
| 6-4-31 | 45½ | 41⅞ | 28¾ | 27 | 49⅝ | 45½ | 5½ | 4⅞" |

"The rule of accountability, as applicable to executors, administrators, guardians, and other trustees, is one of very great importance: the precise limitations of which are not, and perhaps cannot be definitely traced or defined, in their application to particular cases. Much must be left to the discretion of the courts, who will duly estimate the lights and shadows of cases as they arise, and with careful hand adjust acknowledged principles to the case. It is peculiarly a branch of equity jurisprudence, where the conscience of the chancellor, enlightened and controlled by adjudicated precedents, is the umpire. This I may say, however, that a court of chancery always deals with great tenderness towards a trustee acting in good faith": Keller's Appeal, 8 Pa. 288.

Relative to the question thus raised, we read in Taylor's Estate, 277 Pa. 518, 526: "In Pennsylvania we have a number of cases where this court refused to surcharge executors with losses sustained through holding, for several years after a testator's death, dividend-paying corporate stocks purchased by their decedent . . . but each of these decisions stands on its own facts rather than on any controlling principle . . . ; and the rule in respect to holding non-legal securities owned by a decedent, which governs executors and other personal representatives, with their presumably short-duration trusts, should, for obvious reasons, be more liberal than that governing trustees fixed with the duty of managing an estate during a long period of years."

In Borell's Estate, 256 Pa. 523, the court refused to surcharge the executor for failure to convert securities of the decedent within 1 year from the grant of letters. The decedent died April 13, 1913, and the stock was sold during May, June, and September of 1915, at a price lower than could have been obtained within the year after the death. The court said (p. 524): "Ordinarily it is the duty of an executor to convert personal property within the year following the grant of letters testamentary . . . and the rule is to be more strictly construed where the rights of creditors are affected than in cases where the estate is solvent; but the rule is not an unbending one . . .; if it were, the result would be to divest an executor of a large part of the discretion which the testator gave him and would in many instances impose great hardship upon the residuary legatees, who have the right to take in kind the securities remaining after the payment of the testator's debts. . . ." The court there found that the accountant had acted with "common skill, prudence and caution, and properly exercised the discretion given it by the testator, . . ."

In Brown's Estate, 287 Pa. 499, the testator died in 1910. The executor administered the estate until his death in 1924. The executors of the executor accounted, showing unconverted and undistributed assets. Among these was corporate stock, property of the original testator, which had been held through 14 years. Referring to Taylor's Estate, supra, the Supreme Court said (pp. 501, 502): "a fiduciary should not hold beyond a reasonable period investments made by the decedent in unauthorized securities unless specially authorized to

do so, and that when a trustee continues to hold such non-legal investments after a time when he could probably dispose of them and a loss occurs, he must be held liable for a failure to exercise due care; *unless he shows that his retention of the securities in question represents, not a mere lack of attention, but an honest exercise of judgment based on actual consideration of existing conditions;* in other words, he is expected to be ordinarily watchful and to exercise normal good judgment: . . .

". . . They need not rush into a conversion of the securities left by the decedent and, under the whip of the law, sell them below what they might normally expect to receive for them, thus causing an estate to shrink out of all proportion to any possible benefit that might arise through a strict application of the rule. . . . In considering the sale of investments . . . or bonds in a depressed market, or stock whose intrinsic value is established, paying dividends equal to and above what would be a normal interest rate, reasonable latitude, according to the circumstances, must be allowed a fiduciary in the disposition of such property."

This case does not present the element of a request to sell, by a beneficiary, suggested in Dauler's Estate, 247 Pa. 356, 359, and which was a decisive element in Mellier's Estate, 312 Pa. 157.

The stocks were not of a speculative type. All were dividend-paying and represented seasoned and long-established values. The accountant qualified February 22, 1931, and converted the stock as of August 28, 1931, approximately 6 months thereafter. Beginning October 1929, practically all stocks entered a state of alternating declines, leading to constantly-falling levels. Financial and economic confusion and waning confidence prevailed throughout the world. Legislative remedies were applied, and economic theories were invoked. Relief and recovery seemed promising, but in all cases, until now, proved temporary. Prices fell far below real intrinsic values. The prudent investor justifiably held on to seasoned investments for a return to normal values.

"The law requires common skill, common prudence and common caution, in the administration of estates by trustees. It has been held over and over again that executors, administrators and guardians are not liable beyond what they actually received unless in case of gross negligence": Dauler's Estate, 247 Pa. 356, 359; Nemon's Estate, 301 Pa. 425.

"If there is nothing wilful in the conduct of the trustee, no *mala fides*, the court will always favour him. To subject him to losses which he could not foresee, would be manifest hardship, and would be deterring every one from accepting such an office": Keller's Appeal, supra, p. 290.

Our conclusion is that the accountant committed no error and these objections to the account must be dismissed.

Objection to payment by the accountant of interest on moneys advanced for redemption of assets held collaterally, as hereinbefore set forth, cannot be sustained. The account shows that income from these assets was regularly received and charged. No sufficient reason has been advanced for nonpayment of interest on a proper debt and under proper handling.

Objection was made to the credit taken for accountant's compensation. Examination of the account and the condition of the assets, at the accounting, satisfies us that the credit taken was fully warranted. A slight reduction might be made on account of unconverted assets. Such reduction would, however, probably be more than overcome by the allowance of proper compensation for the work entailed and the hazard encountered in the handling and conversion of the assets. The objection is accordingly dismissed. . . .

Objection was also made to the overpayment of transfer inheritance tax. From the voucher produced, it appears that a partial payment of tax was made on the sum of $35,000. There was no deduction for debts, funeral expenses, and costs of administration. As the total debits in the account aggregate only $47,123.45, and as there was paid to Moyer and Company $16,561.57 to redeem the collateral held by it, it is obvious that there has been an overpayment of tax. On the record, it would seem that no final assessment of the tax has been made. When made, it will of course show that there has been an overpayment. The auditing judge is also informed that an application for a refund has been made to the register of wills.

As the auditing judge has no power to assess tax, he is unable to determine what the surcharge ought to be; and if the accountant is successful in obtaining a refund he cannot be surcharged for an overpayment. If, however, the request for a refund is refused, then the accountant's liability for an overpayment is clear.

In the present condition of the record, all that the auditing judge can do is award the balance, plus the refund of tax, if any, and to grant leave to the residuary legatees to ask for a further hearing in the event that the application for refund is refused. Pending the final determination of this question, the executor is not entitled to a discharge. . . .

*Herman Steerman*, for exceptants; *John Wintersteen*, contra.

GEST, J., November 3, 1933.—The exceptants sought to surcharge the executor for loss occasioned by its failure to sell certain stocks of the decedent, which at the time of his death were pledged with a broker as collateral security for a loan. The exceptants claimed that the executor was guilty of gross negligence in failing to convert the stocks immediately. It would be going entirely too far to hold that an executor is bound in such a state of affairs to sell at once or be responsible for losses occasioned by his failure to do so. The general rule should apply that he is bound to exercise his honest judgment based on his actual consideration of existing conditions. The rule is the rule of prudence: Schouler on Wills, Executors and Administrators (6th. ed.), sec. 2277. It may be conceded that an executor confronted with such conditions is placed in a position of unusual difficulty, for at any moment the broker pledgee may call for additional margin and, in default thereof, sell the stocks in the open market for what they will bring. The decision must be made on the spur of the moment. So when, in this case, the broker made a call for further margin, the executor advanced money from its individual or corporate assets to pay off the loan and take over the securities. This was done because, as the vice president of the corporate executor testified, he felt that the stocks could be given better attention and that it was better to do this than leave them in the broker's hands. The action of the executor, intended to safeguard the estate, should indeed be commended rather than criticized. The Supreme Court said in McKerrahan, to use, v. Crawford's Executors, 59 Pa. 390, that there was nothing wrong in an executor buying a judgment against the estate with his own money if the estate had not the means of paying it off. The testimony showed that the vice president of the executor in the uncertain conditions of the market exercised his best judgment based on his actual consideration of the facts as they existed, and the auditing judge, in a very careful adjudication, refused the surcharge: Brown's Estate, 287 Pa. 499; Donnelly's Estate, 8 Dist. R. 182; Curran's Estate, 17 D. & C. 435, affirmed in 312 Pa. 416.

The adjudication with respect to the overpayment of inheritance tax requires no comment. The auditing judge ruled the question correctly.

All the exceptions are dismissed, and the adjudication is confirmed absolutely.