## Casani's Estate. No. 2

Before Van Dusen, P. J., Stearne, Sinkler, Klein, Bolger, and Ladner, JJ.

*S. Eugene Kuen, Jr.*, and *Frederick V. Hebard*, of *Clark, Hebard & Spahr*, for exceptants.

*Charles C. Townsend, H. Justice Williams, Roland C. Heisler, Thomas B. K. Ringe, Thomas Stokes*, and *R. M. Remick*, for Corporate Fiduciaries Association of Philadelphia, amicus curiæ.

*Park J. Alexander, Robert J. Dodds, John B. Eichenauer, Alexander B. Gilfillan, Howard Zacharias*, and *Charles F. C. Arensberg*, for Corporate Fiduciaries Association of Allegheny County, amicus curiæ.

*Harpur M. Tobin* and *David D. Goff*, guardian ad litem, contra.

STEARNE, J., August 2, 1940.—This case comes before us on reargument, following our decision reported in 37 D. & C. 182. The basic inquiry is the determination of the *time* within which a *trustee* is required to convert "inherited" nonlegal securities.

The Supreme Court, in Seamans' Estate, 333 Pa. 358, following comment (*b*) to section 230 of the A. L. I. Restatement of Trusts, and citing the English case of Hughes v. Empson, 22 Beav. 181, 52 Eng. Repr. 1077, decided that the trustee must sell *promptly*. Incorporating the text of the comment of the Restatement by way of a footnote, the undoubted effect of the opinion was to decide that "*any time within a year*" is to be regarded as *presumptively* prompt or "reasonable".

This decision has had a profound effect upon the liability of trustees who have delayed converting nonlegal securities beyond a year. The present trustees, as well as counsel for the Corporate Fiduciaries Associations of both Philadelphia and Allegheny Counties, maintain that the foregoing pronouncement constitutes a departure from the previous decisions of the Supreme Court and the long-established rule of "honest exercise of judgment based on actual consideration of existing conditions". It is urged that its effect is to penalize trustees who have acted under the previous pronouncements of the Supreme Court. The orphans' court, at the first argument, was urged to decide that the statements made in Seamans' Estate, supra, constituted dicta; that if the decision was in fact the rule, then it should not be applied retroactively but should exclusively relate to cases where the trusts arose after the date of the decision; and, finally, we were asked to declare that the true rule was not as stated in Seamans' Estate, but the old rule restated in Nola's Estate, 333 Pa. 106.

The orphans' court (see 37 D. & C. 182) concluded that it was bound by Seamans' Estate as this case was then the most recent unreversed or unmodified decision of the

Supreme Court. It declined to pass upon any of these questions.

After our decision, supra, and before appeal, the Supreme Court filed two opinions: Clabby's Estate, 338 Pa. 305, and Shipley's Estate (No. 1), 337 Pa. 571. As these cases employ language which is apparently at variance with what was written in Seamans' Estate, this court, upon its own motion, directed a reargument.

Counsel for the parties, and for the amici curiæ, have reargued this case with consummate skill, and have furnished the court with excellent briefs wherein all reported cases, in this field, have been cited, analyzed and discussed: In re Bailey & Regar's Trust, 29 D. & C. 215; Bartol's Estate, 182 Pa. 407; Berges' Estate, 30 D. & C. 549; Bohlen's Estate, 75 Pa. 304; Borell's Estate, 256 Pa. 523; Brown's Estate, 287 Pa. 499; Brown's Estate, 25 D. & C. 285; Calhoun's Estate, 6 Watts 185; Carwithen's Estate, 28 D. & C. 66; Clay's Estate, 25 D. & C. 257; Coggins' Appeal, 3 Walker 426; Curran's Estate, 312 Pa. 416; Curran's Estate, 18 D. & C. 103; Dauler's Estate, 247 Pa. 356; Dempster's Estate, 308 Pa. 153; Dickinson's Estate, 21 D. & C. 247; Edwards' Estate, 6 D. & C. 121; Elkins' Estate, 20 D. & C. 483; Elverson's Estate, 15 D. & C. 383; Fahnestock's Appeal, 104 Pa. 46; Gardner's Estate, 323 Pa. 229; Girard Trust Company's Appeal, 13 W. N. C. 367; Hammett's Estate, 23 D. & C. 353; Heyl's Estate, 29 D. & C. 672; Hollins' Estate, 29 D. & C. 307; Ingram's Estate, 30 D. & C. 400; Jackson's Estate, 16 W. N. C. 19; Jenks' Estate, 19 D. & C. 479; Kelch's Estate, 21 D. & C. 204; Komara's Estates, 311 Pa. 135; Linnard's Estate, 16 D. & C. 143; Maser's Estate, 21 D. & C. 559; Mellier's Estate, 312 Pa. 157; Mitchell's Estate, 21 D. & C. 225; Neff's Appeal, 57 Pa. 91; Nola's Estate, 333 Pa. 106; O'Brien's Estate, 18 D. & C. 501; In re Ogle's Estate, 5 Pa. 15; Old's Estate, 176 Pa. 150; Reinhard's Estate, 322 Pa. 325; Schóllenberger's Estate, 30 Schuyl. 407; Skeer's Estate, 236 Pa. 404; Stanton's Estate, 7 W. N. C. 18; Stephen's Estate,

320 Pa. 97; Stewart's Appeal, 110 Pa. 410; Taylor's Estate, 277 Pa. 518; Webb's Estate, 165 Pa. 330; Williamson's Estate, 12 Phila. 64; Woodward's Estate, 27 W. N. C. 407; Seamans' Estate, 333 Pa. 358; Clabby's Estate, supra; Shipley's Estate, supra.

With the record in this situation we are required to determine what is the controlling rule, and to apply it to the facts of this particular case.

Of one thing there can be no dispute. When a trustee receives nonlegal securities as part of a trust the duty is to *convert*—not to retain. See Taylor's Estate, 277 Pa. 518, Mellier's Estate, 312 Pa. 157, A. L. I. Restatement of Trusts §230, Fiduciaries Act of June 7, 1917, P. L. 447, sec. 49 (e) 1 and 2, as amended by the Act of May 28, 1937, P. L. 1037, and Brown's Estate, supra.

In this connection, our brother, Van Dusen, P. J., made a most cogent remark in O'Brien's Estate, supra, p. 502, which has particular application here:

"In my opinion, it is the duty of a trustee to sell nonlegal securities as soon as they can be sold *at a reasonable price*. He is not to speculate, and is not to hold on in expectation of a better price, no matter how much information he may have, and how considered his judgment may be." (Italics supplied.)

This brings us to the consideration as to *time* within which such conversion must be made. The text of the Restatement of Trusts, §230, defines this period: *"within a reasonable time."* The Fiduciaries Act, supra, sec. 49 (e) 2, states the duty: *"to use reasonable diligence"*; the Act of July 2, 1935, P. L. 545, in sec. 2: *"due care and prudence."* (Italics supplied.)

Without attempting to analyze all the cases cited herein, it is a fair statement to assert that from 1837, when Calhoun's Estate, supra, was decided, until 1939 when Nola's Estate, supra, was written, the "reasonable time" within which a *trustee* was required to convert nonlegal securities was held to depend upon the trustee's *"common skill, common prudence and common caution"*.

Calhoun's Estate, supra, uses these exact words (p. 188):

*"All that a court of equity requires from trustees, is common skill, common prudence, and common caution."* (Italics supplied.)

Nola's Estate, supra, p. 109, employs different words, but expresses the same thought: A fiduciary is excused if retention *"represents 'the honest exercise of judgment based on actual consideration of existing conditions; in other words, he is expected to be ordinarily watchful and to exercise normally good judgment.'"* (Italics supplied.)

It is to be observed that there is an entire accord between all the decided cases and the acts of assembly with the *text* of §230 of the Restatement. Such time is defined as *"reasonable"*, and depending upon the common skill, common prudence, and common caution of the fiduciary.

The cause of the present confusion, in our opinion, arises because of comment (*b*) to §230 of the Restatement of Trusts, reading as follows:

*"b. Time of conversion.* When there is a duty to convert trust property, the conversion must be made within a reasonable time after the creation of the trust. Ordinarily any time within a year is reasonable, but under some circumstances a year may be too long a time and under other circumstances a trustee is not liable although he fails to effect the conversion for more than a year. Thus, if there is a ready market for the property, it would usually be improper to delay the sale for a year. If, however, the property even though it has a ready market could not be sold except at a sacrifice, it may be proper for the trustee to delay the sale for more than a year. The question in each case is whether under all the circumstances the trustee acted with prudence in delaying the sale."

Certainly in none of the cases comprising the field of the present inquiry was it ever stated as respects a *trustee* that "ordinarily any time within a *year* is reason-

able. . . ." This "thumb rule" of a year first made its appearance in the *comment*.

We have read, with considerable interest, the Pennsylvania annotations to the Restatement, as well as the English case of Hughes v. Empson, supra, cited in the footnote (p. 363) of the Seamans case. An examination of these cases reveals that, whenever a *year* is mentioned, it is always in relation to a situation of an *executor* or administrator.

(In Komara's Estates, supra, a guardian was surcharged because it accepted nonlegals instead of a cash award, and made no investigation of the securities for over six months.)

But there is a most apparent reason why the period of one year (now six months) must be taken as an initial measure as respects conversion of securities by an executor or administrator.

The duties of an executor or administrator are relatively *temporary* in character. Such fiduciary is entrusted to: (1) Collect the assets; (2) pay the debts, and (3) make distribution. The distinction between the duty of executor and a trustee is: it is the duty of an executor to collect and distribute, and of a trustee to hold and retain: Chambersburg Saving Fund Association's Appeal, 76 Pa. 203; Taylor's Estate, supra. See Hunter's Pennsylvania Orphans' Court Commonplace Book, vol. 1, §17(*f*), p. 501 et seq.; Remick's Pennsylvania Orphans' Court Practice, vol. 1, chap. XI et seq.; A. L. I. Restatement of Trusts, §6(*a*) and (*b*).

The Act of March 15, 1832, P. L. 139, sec. 15, fixed the period of filing accounts by executors or administrators at *one year*. This period so remained until the enactment of the Fiduciaries Act of 1917, supra, sec. 46(*a*), which reduced the time for filing such accounts to *six months*.

The duty of an executor or administrator to ordinarily convert within *one year* or *six months* is discussed in Borell's Estate, supra (one year), and Gardner's Estate, supra (six months), both of which are cited in the Penn-

sylvania annotations in comments to §230 of the Restatement:

In Borell's Estate it is written (pp. 524-525) :

"Ordinarily it is the duty of an executor to convert personal property within the year following the grant of letters testamentary (Merkel's Est., 131 Pa. 584, 612), and the rule is to be more strictly construed where the rights of creditors are affected than in cases where the estate is solvent; but the rule is not an unbending one (Dauler's Est., 247 Pa. 356) ; if it were, the result would be to divest an executor of a large part of the discretion which the testator gave him and would in many instances impose great hardship upon the residuary legatees, who have the right to take in kind the securities remaining after the payment of the testator's debts, the costs of administration, and any specific or pecuniary legacies given by the will.

"In the light of all the testimony the auditing judge is of the opinion that the accountant acted in this matter with common skill, prudence and caution, and properly exercised the discretion given it by the testator, and therefore should not be surcharged, *unless a surcharge must result for no other reason than because of the failure to liquidate the stock within the year. . . .*" (Italics supplied.)

In Gardner's Estate, supra, the court said (pp. 235-236) :

"Appellant insists that the executor should be surcharged with the losses, pointing to the duty of the executor to file an account within six months after the grant of letters, as required by section 46 (a) of the Fiduciaries Act of June 7, 1917, P. L. 447, and to our numerous decisions stating that an executor's or administrator's primary duty is to liquidate his decedent's assets and pay debts: *Johnston's Est.*, 9 W. & S. 107; *Merkel's Est.*, 131 Pa. 584, 18 A. 931; *Constable's Est.*, 299 Pa. 509, 149 A. 743; *Gilliford's Est.*, 281 Pa. 582, 127 A. 238; *Stephen's*

*Est.*, 320 Pa. 97, 181 A. 559; *Taylor's Est.*, 277 Pa. 518, 121 A. 310; *Riebel's Est.*, 321 Pa. 145, 184 A. 118.

"Our cases show, however, that the rule is subject to exceptions, especially where, as here, creditors are not subject to the hazard of insolvency. As was said by Judge Gummey, whose opinion we approved in *Borell's Est.*, 256 Pa. 523, 524, 100 A. 953: 'Ordinarily it is the duty of an executor to convert personal property within the year following the grant of letters testamentary *(Merkel's Est.*, 131 Pa. 584, 612 [18 A. 931]), and the rule is to be more strictly construed where the rights of creditors are affected than in cases where the estate is solvent; but the rule is not an unbending one *(Dauler's Est.*, 247 Pa. 356 [93 A. 511]); if it were, the result would be to divest an executor of a large part of the discretion which the testator gave him and would in many instances impose great hardship upon the residuary legatees, who have the right to take in kind the securities remaining after the payment of the testator's debts, the costs of administration, and any specific or pecuniary legacies given by the will.' Where the rights of legatees only are involved, a more liberal view of the executor's discretion is to be adopted: *McNair's App.*, 4 Rawle 148, 157; *Semple's Est.*, 189 Pa. 385, 389, 42 A. 28."

In Gardner's Estate an opinion of Mr. Justice Linn is quoted (Stephen's Estate, supra), wherein he wrote (p. 236) : " 'It is true that ordinarily *an executor* should, as expeditiously as possible, convert his decedent's personal property in possession, but this rule varies with circumstances.' "

Riebel's Estate, 321 Pa. 145, was also cited and quotation made therefrom (p. 236) : " 'Even in the cases of executors and trustees, if common prudence and good faith are exercised, they will not be surcharged for retention of such securities.' "

It would, therefore, clearly appear that, whereas there exists a statutory period (now six months) within which an executor or administrator should convert securities,

or bear the burden of justifying his retention, no such period of time prior to Seamans' Estate had ever been applied, in any of the decided cases, to a *trustee*. As respects a trustee the test had always been, according to the circumstances in each particular case, "common skill, common prudence, and common caution".

As respects a trustee, in our opinion, the *text* of section 230 of the Restatement of a *"reasonable time"* is accurate, whereas the statement in comment (*b*) that *"ordinarily any time within a year is reasonable"* is not justified by the decided cases in Pennsylvania.

Doubtless confusion has been occasioned by language in the many cases applying to fiduciaries *generally* which, in certain circumstances, might equally relate to trustees and to executors. In the development and statement of principles of law errors are apt to arise. A somewhat similar situation arose in Levy's Estate, 333 Pa. 440 (orphans' court, 34 D. & C. 312-21) where the *text* of the Restatement proved correct but the *comment* was obviously inaccurate.

The injustice of presently fixing a rule such as set forth in Seamans' Estate is to *now* subject trustees to liability for surcharge where they have in good faith and with skill, prudence, and judgment retained nonlegals for over one year, after acting in conformity with pronouncements of the Supreme Court for over a hundred years. They find themselves as between jaws of a pincer.

On March 25, 1940, two decisions were rendered by the Supreme Court, which unquestionably contain language at variance with the principles stated in the Seamans case. They are Clabby's Estate, supra, and Shipley's Estate (No. 1), supra.

In Clabby's Estate, the trustees retained nonlegals for approximately nine years (1928 to 1937). The orphans' court surcharged based on market values *one year* after commencement of the trust. Reviewing many of the authorities, the action of the orphans' court was reversed (1) because of acquiescence of beneficiaries, and (2)

because the retention of the securities was not negligent and the will permitted retention. Two justices concurred as to acquiescence, but dissented as to the conclusion that there was no negligence, or that there was a permission to retain.

A reading of the opinion clearly discloses that a majority of the court held with the old-established rule starting with the leading case of Calhoun's Estate, 6 Watts 185, of common skill, common prudence, and common caution.

In Shipley's Estate (No. 1), the account was that of an *executor*. The claim was made that the loss was occasioned by failure to convert *within one year*, because of failure to exercise common prudence and caution. The auditor found acquiescence. The lower court declined to accept the findings of the auditor, but the Supreme Court reversed. Mr. Justice Maxey, in writing the opinion, reviews many of the cases herein referred to, and again quotes the ancient phrase "common skill, common prudence, and common caution" first expressed in Calhoun's Estate, supra, over a hundred years ago. The justice also made use of this most significant statement (p. 573):

*"As each case is in its circumstances sui generis, the decision must depend on the circumstances, and for this reason, seldom, if ever, is the decision in one case an absolutely controlling precedent when another arises."*

From a consideration of the various decisions of the Supreme Court, we have formed the following opinion:

1. A trustee who receives nonlegal securities as part of the trust res is under a duty to convert same within a reasonable time.

2. What is a reasonable time must depend upon the circumstances of each particular case, and requiring the trustee to exercise common skill, common prudence, and common caution.

We must apply these principles to the facts of this particular case.

Decedent died September 13, 1930. Among his assets were five groups of nonlegal stocks and bonds:

242

6 $1,000 Lehigh Valley 4% cons. mtg. bonds;
200 shs. Deposited Bank Shares, series B-1;
100 shs. Union Traction Company;
915 shs. United Gas Improvement Company, common;
50 shs. General Electric Company, common.

It is a matter of judicial knowledge that in September 1930 the financial walls were falling (see dissent of Chief Justice Schaffer in Seamans' Estate). The fiduciaries were confronted — and still are confronted — with the problem whether to sell the securities at a terrific sacrifice or to hold them. The investments were heretofore regarded as safe and sound, and the market was far below what is deemed to be their true intrinsic values. Even today no man can be reasonably certain what is liable to happen in the economic, social, or political world.

If the rule as promulgated in Seamans' Estate prevails, one year after the securities came into the trustees' hands they should have converted them, except in the absence of unusual circumstances. Here, of course, all the securities could have been sold in the open market, *at a price*. The auditing judge allowed three years instead of one, thereby demonstrating that even he recognized the trustees' difficulty of arriving at a decision. This clearly emphasizes the difference in application of the rule of Seamans' Estate as compared with the ancient principle heretofore applied.

The trustees recognized that they possessed nonlegals. The record is replete with uncontradicted proof that they consistently sought expert advice as to the wisdom of selling or retaining—always with the best interest and protection of the estate in mind. After the award to them as trustees in October 1931, they continued this attention. In December 1931, they entered into an agency agreement with one of the largest and soundest trust companies in order to "collaborate" with experienced men; they voluntarily surrendered to that company three percent of their five-percent commission for this service. Not only did the trustees constantly and continuously con-

sult with the officers and employes of the trust company, but they consulted other bankers, brokers, and a city official—all of whom advised and evidently still advise against conversion. At no time is it apparent in the testimony that the retention by the trustees was by way of speculation and to hold on in order to receive a better price than the securities were reasonably worth. Upon the contrary, the testimony reveals that the retention was a bona fide effort to retain until such time as a sale of the securities would realize what the trustees deemed to be their true value. However mistaken their judgment may have proven—a hindsight which may not be substituted for foresight—there can be no question that these fiduciaries, to the best of their ability, and with the assistance of the best advice they could obtain, acted with common skill, common prudence, and common caution.

We, therefore, conclude, upon reconsideration, that there shall be no surcharge imposed upon the accountants, in the circumstances of this case, for the retention of these nonlegal securities.

This determination results in the reversal of our former decision reported in 37 D. & C. 182. In disagreeing with the findings of the auditing judge we do not intend to overrule a finding of fact within the ordinary meaning of that term. The present findings are manifestly the auditing judge's *conclusions* based upon uncontradicted evidence and purely the result of reasoning. In such circumstances the court in banc, and the appellate court, are equally competent as the auditing judge to draw conclusions: Dorrance's Estate, 309 Pa. 151; Boswell's Estate, 109 Pa. Superior Ct. 365-68. Thus, to say that the "coup de grace" of the trustee's case was that his endeavor to secure the amount of the appraised value of the securities (in the inventory) amounted to *speculation* is clearly a conclusion or deduction. The appraised value of an asset in an inventory and appraisement is *presumed* to be its true value at such date: Hunter's Pennsylvania Orphans' Court Commonplace Book, vol. 1, p. 683 and p.

500. Wherefore, the declaration by the witness that he desired to obtain the appraised value is clearly the equivalent of the declaration to retain the asset until such "reasonable" or appraised value could be obtained. The majority prefer to regard the testimony as a *whole*, rather than rely upon excerpts therefrom—and even those portions possibly not considered in connection with their true context.

The guardian and trustee ad litem is authorized to appeal this case to the Supreme Court, the costs and reasonable expenses therefor to be advanced by the trustees from the estate.

Our former decision reported in 37 D. & C. 182, is now reversed, the exceptions are sustained, and the adjudication as herein modified is confirmed absolutely.

BOLGER, J., dissenting.—The action of the majority of the court in reversing its decision, reported in 37 D. & C. 182, following reargument which was allowed because of possible departure or variation from or overruling of Seamans' Estate is unwarranted and unjustified. Such action constitutes without cause a shift of position both on the law as well as the conclusions of fact and the mixed questions of law and of fact involved.

In Clabby's Estate, 338 Pa. 305, the Supreme Court reversed on three grounds, acquiescence, no negligence, and authority contained in the will. Neither the majority nor the concurring opinion expressly states that, if the first and third elements, viz., acquiescence and authority in the will were absent, the decision would have been the other way. Had the finding of no negligence been the substantiating reason, the concurring opinion expressing disapproval of such finding would have been a dissenting opinion. It is remarked that both majority and concurring opinions cited Seamans' Estate with approval. That the finding of no negligence was not a substantiating factor in the opinion is stated on page 313 of Clabby's Estate, where Justice Barnes says:

"In view of our conclusion upon the question of acquiescence, it is unnecessary to determine whether the retention of these stocks by the trustee was negligent."

I, therefore, fail to gather from these circumstances why we are justified in finding therein any authoritative departure from Seamans' Estate, 333 Pa. 358.

As to Shipley's Estate (No. 1), 337 Pa. 571, the account was that of an executor whose responsibilities are, as Judge Stearne points out in the majority opinion, different from those of a trustee. Taylor's Estate, 277 Pa. 518, reminds us (p. 526) : "the rule in respect to holding non-legal securities owned by a decedent, which governs executors and other personal representatives, with their presumably short-duration trusts, should, for obvious reasons, be more liberal than that governing trustees fixed with the duty of managing an estate during a long period of years." Shipley's Estate, therefore, cannot be said to alter Seamans' Estate. Consequently, in my opinion, if we were right in our previous opinion, the present majority decision is wrong. Since the facts of this case are four-square with Seamans' Estate, it follows that the majority refused to follow that decision. I prefer to recognize it as authority and, therefore, to follow it.

The majority opinion condemns what it terms the injustice of the result of Seamans' Estate in that it "changes the rules after the start of the game", i. e., it establishes a new rule of time within which presumptively a trustee must dispose of retained non-legal investments, even though he in good faith exercises common skill, prudence, and judgment. To my mind, no such new rule is therein contained. True, the law is and always has been: (1) Conversion within a reasonable time; (2) a reasonable time depends upon the facts of each case, and the trustee is exonerated if he fails to sell in the exercise of common skill, common prudence, and common caution.

The applicable legislation, which is not considered in the majority opinion, but which must be regarded as con-

trolling, is briefly given in the footnote to Seamans' Estate, at page 363, as follows:

"The Fiduciaries Act of 1917, P. L. 447, section 49 (e) 2, provided that 'Where stocks, bonds, or other securities have been distributed in kind . . . to any fiduciary, it shall be the duty of such fiduciary to use reasonable diligence in converting such securities as shall not be investments now or hereafter authorized by law.' The Act of May 28, 1937, P. L. 1037, section 3, amending section 41, par. 1, clause a, subsection 13, of the Fiduciaries Act (as added by Act of July 2, 1935, P. L. 545) provides that the fiduciary shall not be liable if he 'exercises due care and prudence in the disposition or retention of any such non-legal investment.' Section 4 eliminates the clause in the Fiduciaries Act requiring the use of reasonable diligence, and provides that if the fiduciary be doubtful as to the propriety of selling the securities he may apply to the orphans' court for authority and direction to retain them."

The legislative history thus enumerated, it will be observed, starts in 1917 with a more rigid rule which is relaxed considerably by subsequent amendment. No "change of the rules after the start of the game", is therefore involved, certainly none to the detriment of fiduciaries.

The majority opinion misses the significance of Justice Stern's remarks on page 362 of the report of Seamans' Estate, as follows:

"Notwithstanding the broad tenor of some of the language thus quoted, a fiduciary is not justified in inferring that the principle which exempts him from liability for acts performed in good faith and with ordinary prudence necessarily applies wherever there is a failure to convert nonlegal securities within a reasonable time. The law imposes limitations upon 'ordinary prudence' in such cases in order to preserve the differentiation between nonlegal and legal securities, and between fiduciaries and others as to the right to speculate."

That a new rule is not laid down in this decision is evidenced by the principles enunciated on page 363:

"1. If a fiduciary receives nonlegal securities as part of the trust estate, he is vested by law with a measure of discretion and allowed to some extent to exercise his own judgment as to the wisdom of selling the securities under prevailing market conditions. However, in the absence of exceptional circumstances, he should convert them promptly. This does not require that he sell them *immediately*, as 'under the whip of the law,' but it means that he should not continue to hold them indefinitely merely because he believes that they will appreciate in value and would therefore retain them if they were his own securities.

"2. Under certain circumstances a fiduciary is excused from the prompt sale of nonlegal securities which is otherwise required. Such circumstances cannot be completely catalogued; they must be considered in each case as they arise."

He then goes on to illustrate such circumstances, including that where a sale could be effected only at a sacrifice but there is a reasonable likelihood of a return to stable conditions which will restore the normal value. This language, to my mind, is the application of the rule of "reasonable diligence" as distinguished in phraseology from the rule of common prudence and skill which, to my mind, makes the rule one of logic and of reason in preserving the main elements of the question, viz., necessity of conversion of nonlegals as distinguished from legals, as to which the rule of common prudence obtains without emphasis on prompt sale. The rule of conversion of legals retained by a trustee is the same as that of legals purchased by the trustee—ordinary care, common skill, and prudence, but certainly cannot now and never could by any process of reasoning be held to apply to nonlegals either in retention or original purchase by a fiduciary.

Seamans' Estate simply emphasizes this greater duty and higher degree of care regarding nonlegals.

The majority opinion in its earlier phases refers to *primary* duty to convert and approves President Judge Van Dusen's language in O'Brien's Estate, 18 D. & C. 501, where he says (p. 502) : ". . . it is the duty of a trustee to sell nonlegal securities as soon as they can be sold at a reasonable price", but fails to apply it. This I believe is because the majority are so impressed with the rule of common skill and prudence that they ignore the emphasis placed on the necessity for conversion and further forget, as stated in Taylor's Estate, supra, and Shipley's Estate, that each case is sui generis. In other words, that the doctrine of common skill, caution, and prudence has a qualifying clause "under the circumstances". The special circumstance here is that the investments are nonlegals. As Moschzisker, C. J., pointed in Taylor's Estate, supra (p. 529) : "The law has erected a guidepost for trustees to observe, reading 'Legal Investments' ". This guidepost was ignored by the trustees in this estate, as pointed out hereinafter. Another element overlooked in the majority opinion is that the present trustees were vested with the knowledge that because testator did not in his will authorize retention he desired the estate to be invested in securities authorized for the investment of trust funds; this is especially true where the trust is to continue over an extended period of time: Seamans' Estate, supra. This principle takes on added significance here because, though testator did not die until a year after the financial collapse of October 1929, he nevertheless withheld from his trustees authorization to retain nonlegals.

The only new doctrine that Seamans' Estate introduces is the presumptive period of one year. In so doing it follows the cited authority in the Restatement of Trusts. It is clear that the one-year period is not inflexible but is to be applied or varied according to the circumstances. It is but a presumption operating to shift the burden of proof to the fiduciary to justify the retention for a longer period of time and is borrowed from the rule fixing the

presumptive period for sales by executors or administrators. There is little, if any, room to quarrel with this. It is merely a more specific danger signal to fiduciaries who otherwise might think they are entitled to hold in perpetuity as did the trustees in this case, who still retain all the securities constituting the subject matter of this controversy.

Irrespective of the question whether Seamans' Estate fixes a higher degree of care than obtained theretofore, I am of opinion that under either theory these trustees must be surcharged. I cannot subscribe to the conclusions that "At no time is it apparent in the testimony that the retention by the trustees was by way of speculation and to hold on in order to secure a better price than the securities were reasonably worth." This conclusion is made without assigned reasons of fact or of law and is the exact reverse of that found in Judge Stearne's prior opinion. Epitomizing the findings therein reached, he said (p. 187) : "However, the crux of the case is that at least by October 1933, the loss had definitely been established." If that was the crux of the situation in the prior opinion, it is the crux of the situation now and constituted a finding of fact which we then unanimously approved, because it is supported by ample evidence. Therefore, the decision not to convert at that time—October 1933—but to continue to hold thereafter, constituted speculation as a matter of law. There is no new evidence to the contrary before us and I, therefore, fail to understand and refuse to follow what is now the diametrically opposite conclusion.

The chief trouble with the present trustees was that they were proceeding up a blind alley in their investigations and inquiries into the prudence of holding or selling. In doing so, they neglected the *primary legal duty to sell*. The finding of the auditing judge is supported by the identical finding based upon identical facts in Seamans' Estate, supra, at page 366, wherein, commenting on the cessation of dividends on the securities in that estate

during 1931 and 1932 and the slump of market prices, it is stated:

". . . appellant should have realized that the probable duration of the depression could not be foretold, but that it certainly was not merely a temporary condition and that any conclusion as to whether stocks would recover or sink to still lower levels could be based only on guesswork."

The majority do not even agree with the liberality of Judge Ladner, as auditing judge, in giving the present trustees the benefit of two more years' opportunity to observe this condition than the one year allowed in Seamans' Estate.

Starting with the fact that Mr. Casani, one of the trustees, was also a remainderman, we can assume that he was at worst not going to injure his own financial stake in the estate. However, the auditing judge has questioned only three aspects of his testimony: (1) His statement that he was not speculating; (2) that Mr. Loesche, of the Girard Trust Company, continually advised him not to sell; and (3) that he received similar advice from others. Mr. Casani's statement that he was not speculating is obviously a conclusion which is effectually shattered by his own testimony. Cross-examined as to the annual statements of the companies whose securities he held as trustee, he admitted current knowledge of the substantial operating losses of the companies and of diminishing dividends, which facts should have convinced him that the reasonable worth of the securities was constantly diminishing, and that there was no "reasonable likelihood of an early return to stable conditions which will restore the normal value". He summed up his attitude in a statement which to my mind is the coup de grace of his whole case (p. 191): "We were merely trying to get for this estate the inventory figures of 1930", which values were fortunately exceeded in the sale of the Pennsylvania Salt stock and Bunte Brothers stock. The language of President Judge Van Dusen in O'Brien's Estate,

supra, is pertinent at this point (p. 502) : "He is not to speculate, *and is not to hold on in expectation of a better price, no matter how much information he may have, and how considered his judgment may be.*" (Italics supplied.) The trustees suited their actions in defiance of this word.

In disbelieving Mr. Casani's statements that he continually obtained the advice of Mr. Loesche, we have Mr. Loesche's own word that he discussed the securities with the trustees, but did not advise them, except in December of 1931, when he stated that the bottom had then been reached. The action of the auditing judge in believing Mr. Loesche and disbelieving Mr. Casani on this point should be sustained as a finding of fact. The majority now accept Mr. Casani's own repeated protestations that he was not holding on merely in hope of saving a loss of corpus and that he was only following advice, though his own admissions and his actions are in complete contradiction. In my opinion, the conclusion thus arrived at is not only unjustified but illogical.

Outside of the Girard Trust Company, the others whom Mr. Casani testified he consulted it appears did not know that the stocks constituting the subject matter of the inquiries were nonlegal investments and, therefore, it is not surprising that they advised the trustees not to sell them, as 'they are good securities, they will come back". Such advice, therefore, is not such as a reasonably prudent man would have relied upon. It is most significant that in these inquiries the trustees never asked the persons consulted when in their opinion the securities would come back, in an endeavor to ascertain when they should fulfil their legal obligation to sell promptly. To my mind, the conclusion is inescapable that the trustees decided to retain them until the inventory values of 1930 could be realized.

For these reasons, I believe all the exceptions should be dismissed.

Ladner, J., joins in this dissent.