## Burns v. Ryan

*Phillip Schuler,* for plaintiff.
*Jay Kahle,* for defendant.

FINK, *P.J.,* September 7, 1984—A complaint in ejectment was filed by plaintiff, William J. Burns, Jr., as owner of a one-sixteenth overriding interest concerning an oil production area containing some 262 acres, more or less, of land in Lafayette Township, McKean County, Pa. Suit was instituted against defendants who were owners of what is commonly known as the "working interest" in and to the oil wells situate in the oil field aforementioned. The cause of action in ejectment on which plaintiff relies concerns the legal interpretation of the wording in one of the leases which was assigned to plaintiff through which he obtained his overriding interest. The wording is as follows:

"Any well on the premises drilled by party of the first part shall be considered to be an abandoned well when, if an oil or gas well, no production has been marketed from such well for a period of six months, or when, if an intake well, such well has ceased to operate for a period of six months, or when the casing or drive pipe has been withdrawn from any well whatsoever."

There were numerous oil wells existing on the 262 acre production field at the time of the operative portion of the lease and assignment aforementioned.

It's plaintiff's contention that defendants, pursuant to their working interest are still working the wells in the field notwithstanding the fact, as alleged by plaintiff, that the wells had not produced any marketable production from January 1, 1982 to September 30, 1982.

The collection system which existed at the oil field was based upon an agreement between the producer and Quaker State Refinery. The producer was to sell and Quaker State was to purchase all oil produced in the production area. And, to effectuate same the producer owned a collection tank on the 262 acres or near said acreage to which all oil produced on the acreage by the producer would be collected. Quaker State laid a pipe from the producer's collection tank to their giant storage tank situate off the premises which was utilized by many producers. Quaker State placed and maintained a seal on the producer's tank which would regulate the flow of oil from the producer's tank to Quaker State's collection tank. Quaker State was the only one which would remove the seal and it was unlawful for any other person or entity to remove the seal which was placed on the flow opening of the tank by Quaker State.

The producer of the subject wells would be paid by Quaker State pursuant to a tank measurement which was done by Quaker State in the producer's tank. Quaker State would pay for the oil produced after the oil was released from the producer's tank and by flow pipes was carried to the large collection tank of the oil purchaser.

The single legal question here presented concerns the interpretation of the term "marketed" production; more specifically is the oil "marketed" when it's directed from the individual wells on the 262 acres to the producer's collection tank or is production "marketed" at sometime thereafter, either when it's allowed to flow from the producer's tank to the purchaser's large collection tank or perhaps when the producers and all other outstanding interests in the production are paid, therefore, by Quaker State.

Plaintiff refers the court to several cases to resolve that question. First case alluded to is Clark v. Wright, 311 Pa. 69, 166 Atl. 775 (1933), which stands for the proposition that if an oil well is not produced and marketed within a reasonable length of time it's "no well at all". The Clark case is not helpful in the instant situation.

In Wolfe v. Texas Company 32 F.2d 425 (1936), it's pointed out that, . . . "there's an implied duty on the part of an oil leasee to make diligent efforts to market the production in order that the leasor may realize on his royalty interest."

Plaintiff points out that the term "market" used as a verb means, (1.) to send or to take to market; (2.) to offer for sale; (3.) to sell. The case, In re Meillier's Estate, 312 Pa. 157, 167 Atl. 358 (1933), states that, "the word 'market' conveys the idea of selling". In the instant case, the evidence, though sketchy, indicated that in the nine month period in question viz: January to September of 1982, most of the wells, (for instance all except two or three) did produce some oil which was conveyed to the producer's collection tank. There was further evidence, somewhat less than compelling, to indicate that the owner of the working interest was "on site" numerous times per week each week during the period in question.

This court therefore, concluded that reasonable attempts were being made to obtain production from the wells by the most recent owners. It should be noted that the current owners were merely "protective owners" at the time in question, but they did work the wells as agents for the prior owners.

This court adopts the first dictionary definition of the work market, "to send or to take to market." This court is of the belief that the oil in question was produced and was sent or taken to market when it was conveyed from the oil field to the producer's collection tank. This court is of the opinion that because Quaker State had control over the measurement of the oil in the producer's tank, the maintenance of the producer's tank, the seal on the producer's tank and flow out of the producer's tank, as well as the lines leading out of the producer's tank to the larger Quaker State storage tank and that payment was based upon the measurement done by Quaker State in the producer's tank; that the production was "marketed" when oil went in the producer's collection tank.

It should be noted that the provision of the lease and assignment above mentioned refers to "any well". There was testimony that either two or three wells has no production. This court is aware that there's an obligation on the part of an owner of the well, to plug a well when it's no longer producing. This is mandated through the regulations of the Pennsylvania Department of Mines. Plugging involves an expenditure which is certainly beyond a minimal amount. This court believes it would be unfair, inequitable and unjust to find in favor of defendants as it relates to all wells except the two or three which are admittedly not producing; but declare that the two or three wells that are not producing are abandoned and therefore, revert back to the

owner of the overriding interest, which in this case is plaintiff. This would result in plaintiff receiving all of the "chaff" and the owner of the working interest receiving most all of the "wheat". It's the thought of this court that all of the wells in the production area in which defendants have their working interest and plaintiff overriding interest should be considered as a unit and we therefore so find.

Thus, in view of the foregoing, the following

## ORDER

Now, this September 7, 1984 the verdict shall be entered in favor of defendants on plaintiff's action in ejectment.